RAMÓN TORRES ORTIZ y OTROS, demandantes y recurridos, *v.* DR. FRANCISCO J. PLÁ y OTROS, demandados y recurrentes.

*Número:* RE-87-65      *Resuelto:* 9 de mayo de 1989

*Lillian T. De la Cruz,* de *Cancio, Nadal & Rivera,* abogada de los recurrentes; *Jorge Ortiz Brunet,* de *Ortiz Toro & Ortiz Brunet,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

Decidimos hoy, por primera vez, si procede una acción de daños y perjuicios fundamentada en la impericia profesional de un médico al practicarle negligentemente una esterilización a una paciente, quien posteriormente salió embarazada, y qué daños son recobrables.

I

Luego de procrear su primer hijo en 1977, la Sra. Carmen Rosario Negrón trabajó en un empleo temporero por varios meses. Al terminarse el mismo, cursó estudios de ciencias secretariales por año y medio. Tuvo que dejarlos debido a que salió embarazada de su segundo hijo.

La señora Rosario y su esposo, Ramón Ortiz Torres, decidieron que ella volvería a estudiar, luego de su parto, para poder trabajar y mejorar la precaria situación económica del matrimonio.

Decidieron no tener más hijos, por lo que ella se esterilizaría después del alumbramiento. Además de la situación económica, ella sufría de la afección renal conocida como "riñón flotante" y la condición fisiológica de "isoinmunización por factor RH". Apéndice, pág. 4.

El segundo parto fue normal. Como consecuencia de la proyectada esterilización, la señora Rosario decidió que no se le administrara una vacuna llamada "Rhogan" durante este segundo alumbramiento. La misma se administraba para que la condición del factor RH no afectara el embrión en el próximo embarazo. Con el propósito de ser esterilizada, Carmen acudió al Dr. Francisco J. Plá, médico que la atendió durante el segundo alumbramiento.

El 26 de febrero de 1982 el doctor Plá intervino quirúrgicamente a la señora Rosario mediante operación de esterili-

zación con laparoscopio conocida como "laparoscopía". En este proceso se inyecta bióxido de carbono u otro gas en el vientre, que ocasiona la distensión y separación de los órganos para ayudar a detectar los órganos reproductores. Se realiza una pequeña incisión abdominal a través de la cual se introduce el laparoscopio. Se ilumina el interior del abdomen y con una especie de garfios se agarran los tubos de falopio. Se colocan unos anillos, en este caso de silicón (*fallope rings*), que ligan y comprimen los tubos para evitar que pasen los óvulos. Luego de separar los tubos, se sacan los instrumentos y el gas.

Once (11) meses más tarde, el 29 de enero de 1983, la señora Rosario dio a luz su tercer hijo. Varios días antes del alumbramiento estuvo hospitalizada con contracciones uterinas prematuras e infección en las vías urinarias. Al ser admitida, se indicó en el récord que tenía "complicaciones de laparoscopía fallida, infección recurrente en las vías urinarias ('recurrent U.T.I.'), pielonefritis, flebitis en la pierna izquierda y factor Rh negativo no riesgoso (not sensitized)". Apéndice, págs. 5–6.

El mismo día del parto se confirmó que tenía un neumotórax (aire en el espacio pleural entre el pulmón y la pared torácica) que le causó síntomas de dolor y dificultad respiratoria durante el parto y otros dolores. Fue operada al día siguiente para introducirle un tubo hasta el pulmón y sacarle el aire de la pleura. El 3 de febrero se le removió el tubo. Por esa condición sufrió dolor en el pecho, punzadas en el lado derecho del pecho, dificultad respiratoria, adormecimiento del brazo y otros. El 5 de febrero fue dada de alta.

El 21 de marzo de 1983 el doctor González Jové, quien atendió a Carmen en su tercer alumbramiento, la esterilizó mediante el proceso de "salpingectomía bilateral".

En el informe sobre esta operación, el doctor González Jové indicó lo siguiente:

Patient placed in lithotomy position and 18″ folley placed intra uterine cavity. Methelyne Blue dye injected thru folley. There was NO evidence of spillage of Methelyne thru either of Fallope tubes at operation room site . . . Uterus exposed and fallopian tubes examined. The right fallopian tube has evidence of a fallope ring interrupting and narrowing the tube. *The left fallopian tube appeared to be intact and the portion of fallope ring was below the left tube in the meso-ovarian vessels near the round ligament.* Ovaries and uterus are normal in size and shape. In[j]ection of Methelyne Blue dye was done by nurse Miss L. Díaz thru cervical sound (folley 18″) previously placed in the uterus and after in[j]ection of dye there was no evidence of spillage thru neither of fallopian tubes. (Énfasis en el texto original suprimido y énfasis suplido.) Apéndice, pág. 9.

El doctor González Jové hizo un dibujo de donde surgía claramente que el anillo (*fallope ring*), correspondiente al tubo de falopio izquierdo, estaba colocado debajo de éste y no comprimiéndolo, como en el derecho.

Como consecuencia de estos hechos, los esposos Ramón Torres y Carmen Rosario presentaron acción de daños contra el doctor Plá. Alegaron que éste incurrió en mala práctica médica al realizar negligentemente la operación de esterilización y que ellos no prestaron un consentimiento informado. Reclamaron daños por sufrimientos y angustias mentales ocasionados durante el embarazo, el parto y la segunda esterilización, pérdida de ingresos, gastos médicos y de hospitalización, y solicitaron compensación por gastos de manutención y educación durante la minoría de edad de la recién nacida.

El demandado alegó que brindó un tratamiento médico de excelencia y conforme a la mejor práctica de la medicina al momento de ocurridos los hechos aducidos en la demanda. Adujo que en las esterilizaciones siempre existe un margen posible de error, lo que le advirtió a la señora Rosario Negrón.

Los demandantes presentaron, como prueba médica pericial, los testimonios del Dr. Juan Hernández Cibes y del perito economista, Dr. Bartolomé Stipec. El demandado presentó el testimonio del Dr. Adrián Colón Laracuente como única prueba pericial.

El tribunal de instancia declaró con lugar la demanda. En síntesis, determinó que el demandado fue negligente porque el anillo que debió colocar en el tubo falopiano izquierdo lo colocó en los vasos sanguíneos de esa área, debajo del útero, trompas y ovarios, lo cual no impidió que la señora Rosario volviera a quedar embarazada. Además, concluyó que el doctor Plá no informó adecuadamente a la señora Rosario sobre todas las alternativas para la esterilización, por lo que ésta no prestó un consentimiento informado para la operación.

Concedió como daños $40,000 a la señora Rosario y $8,000 al señor Torres por sufrimientos físicos y angustias mentales, y $41,058.34 a la Sociedad Legal de Gananciales por la "expectativa frustrada de ingresos". Además, impuso $5,000 como honorarios de abogado. Apéndice, págs. 44–45.

El demandado recurrió ante nos[1] y alegó que se cometieron los errores siguientes:

### PRIMER ERROR:

Erró el Tribunal al adoptar la siguiente Conclusión de Derecho:

"El anillo que el Dr. González J[ov]é encontró fuera del tubo falopiano no estaba insertado en el ligamento redondo. Si allí hubiese estado, aún podríamos considerar que fue parte de ese margen de error que ya apuntamos y posiblemente, lo estimaríamos dentro de un margen de duda en cuanto a la impericia. Pero no lo estaba. Solamente había quedado colocado cerca del ligamento redondo, pero, no en los vasos sanguíneos

---

[1] El recurrente no impugnó las determinaciones del tribunal de instancia sobre ausencia de consentimiento informado. Por tal razón, no es necesario decidir este asunto. *Garage Rubén, Inc. v. Tribunal Superior*, 101 D.P.R. 236, 242 (1973).

de esa área debajo del útero, trompas y ovarios. *Conclu[i]mos, que esto sí constituye un factor de descuido, negligencia e impericia de parte del demandado, Dr. Francisco Plá en la ejecución del procedimiento de esterilización por laparoscopía que realizó a la codemandante-recurrida Carmen Rosario Negrón."*

### SEGUNDO ERROR:

Erró el Tribunal al condenar al demandado al pago de una suma de dinero por los sufrimientos físicos y angustias mentales que le sobrevinieron a la demandante-recurrida a consecuencia del tercer embarazo y al establecer que fueron resultantes de la negligencia del demandado y al concluir que los esposos demandantes tienen derecho a una indemnización del demandado por los daños físicos resultantes de un neumotórax durante el tercer parto de la demandante-recurrida *aunque no hayan estado relacionados con su condición previa ni hayan tenido secuela.*

### TERCER ERROR

Erró el Tribunal al adoptar, entre sus Determinaciones de Hechos, la determinación número 24 estableciendo que, "[s]egún sus declaraciones, el matrimonio había hecho planes para que Carmen volviese a estudiar tan pronto tuviese el bebé, con la esperanza de que, cuando ella terminara sus estudios, pudiera conseguir un trabajo para ayudar a Ramón", y "[c]omo no pensaban tener más hijos, habían planeado que, cuando Carmen trabajara, podrían ahorrar lo suficiente como para independizarse y hacerse de un hogar donde criar a sus hijos con mayor comodidad".

### CUARTO ERROR

Erró el Tribunal al aceptar la partida especificada en el Informe del doctor Bartolomé Stipec, relativa a la reducción en los ingresos de la familia, porque la madre no pudo generarlos en el tiempo planeado; y erró el Tribunal al estimar justa y suficiente la suma de $22,869.66 por concept[o] de ganancias frustradas.

## QUINTO ERROR

Erró el Tribunal al aceptar la partida de $18,188.68 especificada en el estudio del Dr. Stipec, como compensación a Carmen por el menoscabo de sus oportunidades de empleo y por la *probable* reducción en su ingreso cuando se reintegre a la fuerza laboral. (Énfasis en el texto original suprimido y énfasis suplido.) Solicitud de revisión, págs. 4–6.

Los recurridos comparecieron en oposición y expedimos el auto. Ambas partes sometieron el recurso a base de sus escritos iniciales. Resolvemos.

## II

Recientemente hemos decidido varios casos de daños y perjuicios por alegada mala práctica de la medicina y de la odontología. Estas decisiones han sido exhaustivas en cuanto a la norma mínima de cuidado médico exigible en esta jurisdicción y nuestra función como corte apelativa al revisar las decisiones de los tribunales de instancia. Véanse: *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988), y casos allí citados. No obstante, debido a que nunca hemos decidido si procede una demanda por daños a favor de los padres cuando la recién nacida es una bebé completamente saludable y cuáles son los daños recobrables, incursionamos en este campo.

Hemos encontrado que esta cuestión no ha sido muy discutida en jurisdicciones de derecho civil. Véase L. Martínez-Calcerrada, *Derecho Médico*, Madrid, Ed. Tecnos, 1986, Vol. I, págs. 399–400 y 437–438.

No obstante, en Estados Unidos el tema ha sido discutido ampliamente y existe abundante jurisprudencia, la cual nos es de ayuda para resolver las interrogantes planteadas. Véase *Valle v. Amer. Inter. Ins. Co.*, 108 D.P.R. 692 (1979). Allí se han desarrollado varias posiciones encontradas sobre la procedencia de esta causa de acción y los daños compensables.

La posición más antigua es que no procede indemnización alguna en estos casos (*no recovery rule*). Surgió en la decisión de *Christensen v. Thornby*, 255 N.W. 620 (Minn. 1934). Allí, el doctor demandado le practicó una vasectomía al demandante, ya que después del primer parto de su esposa se le había indicado que ella podría fallecer si salía encinta nuevamente. Luego de la operación, la esposa del demandante tuvo otro hijo que nació sin complicaciones. Al declarar sin lugar la demanda, en la que se reclamaban angustias mentales y gastos del parto, el tribunal expresó que el demandante no había perdido a su esposa y que, por el contrario, recibió la bendición de otro hijo.

Aun cuando esta posición fue generalmente adoptada por las cortes al comenzar a decidir controversias similares, hemos encontrado que al presente ha sido prácticamente descartada. Véase M. Davidson, *Torts — Wrongful Pregnancy — Ordinary Costs of Raising Healthy Child not Recoverable*, 55 Tenn. L. Rev. 153, 158 (1987).

La posición totalmente contraria a la primera es que proceden todos los daños, incluso el costo de crianza y manutención del menor (*full recovery rule*). Esta postura es aceptada hoy día en sólo dos (2) estados. Véanse: *Bowman v. Davis*, 356 N.E.2d 496 (Ohio 1976); *Custodio v. Bauer*, 59 Cal. Reptr. 463 (1967).

Los fundamentos aducidos a favor de la primera postura se refutan según los razonamientos siguientes: el enfoque sobre el daño no se encuentra en el niño, sino en que se trata de una consecuencia directa de la actuación negligente del médico; el beneficio de tener un niño no siempre excede el costo de criarlo como en situaciones de condiciones económicas precarias o inestabilidad mental de los padres; la posibilidad de efectos mentales adversos no debe impedir recobrar los daños, pues no se ha demostrado que siempre ocurran esas consecuencias; los tribunales deben poder distinguir entre reclamaciones fraudulentas y legítimas, y la estimación de

estos daños es similar a la de otro tipo de daños, *e.g.*, lucro cesante.

Las otras dos (2) posiciones son intermedias a las anteriores. Según la de los beneficios (*benefits rule*), se conceden todos los daños de gastos médicos, de angustias y sufrimientos mentales y los costos de manutención del menor, pero de éstos se deducen los beneficios emocionales que reciben los padres por tener al niño.

Se fundamenta en el 4 *Restatement of the Law (Second) of Torts* Sec. 920 (1979), que dispone:

> When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred [upon the plaintiff] a special benefit to the interest [which] was harmed, the value of the benefit conferred is considered in mitigation of damages, [where] this is equitable.

Al estimar los costos de manutención se toman en consideración factores como el tamaño de la familia, el ingreso familiar, la edad de los padres y el estado civil. *University of Ariz. v. Superior Court*, 667 P.2d 1294 (Ariz. 1983); *Ochs v. Borrelli*, 445 A.2d 883 (Conn. 1982); *Jones v. Malinowski*, 473 A.2d 429 (Md. 1984); *Troppi v. Scarf*, 187 N.W.2d 511 (Ct. App. Mich. 1971), leave to appeal den. 385 Mich. 753 (1971); *Sherlock v. Stillwater Clinic*, 260 N.W.2d 169 (Minn. 1977).

La última posición es la que prevalece en la mayoría de los estados. Según la misma, se permite recobrar los daños por concepto de gastos médico-hospitalarios y de angustias mentales y sufrimientos físicos de la primera y segunda esterilización, y del parto, las angustias mentales, el lucro cesante y la pérdida de la compañía y el afecto de su cónyuge. No obstante, no se concede indemnización alguna por costo de manutención del niño. *Boone v. Mullendore*, 416 So. 2d 718 (Ala. 1982); *Coleman v. Garrison*, 327 A.2d 757 (Del. Super. 1974), modified and aff'd, 349 A.2d 8 (Del. Super. 1975); *Flowers v. District of Columbia*, 478 A.2d 1073 (D.C. App.

1984); *Fassoulas v. Ramey*, 450 So. 2d 822 (Fla. 1984); *Fulton–DeKalb Hosp. Authority v. Graves*, 314 S.E.2d 653 (Ga. 1984); *Cockrum v. Baumgartner*, 447 N.E.2d 385 (Ill.), cert. denegado, 464 U.S. 846 (1983); *Garrison v. Foy*, 486 N.E.2d 5 (Ind. App. 3 Dist. 1985); *Nanke v. Napier*, 346 N.W.2d 520 (Iowa 1984); *Byrd v. Wesley Medical Center*, 699 P.2d 459 (Kan. 1985); *Schork v. Huber*, 648 S.W.2d 861 (Ky. 1983); *Pitre v. Opelousas General Hosp.*, 517 So. 2d 1019 (La. App. 3 Cir. 1987), writ granted, 519 So. 2d 105 (La. 1987); *Macomber v. Dillman*, 505 A.2d 810 (Me. 1986); *Miller v. Duhart*, 637 S.W.2d 183 (Mo. App. 1982); *Kingsbury v. Smith*, 442 A.2d 1003 (N.H. 1982); *P. v. Portadin*, 432 A.2d 556 (N.J. Super. A.D. 1981); *O'Toole v. Greenberg*, 477 N.E.2d 445 (N.Y. 1985); *Jackson v. Bumgardner*, 347 S.E.2d 743 (N.C. 1986); *Milde v. Leigh*, 28 N.W.2d 530 (N.D. 1947); *Mason v. Western Pennsylvania Hosp.*, 453 A.2d 974 (Pa. 1982); *Smith v. Gore*, 728 S.W.2d 738 (Tenn. 1987); *Hickman v. Myers*, 632 S.W.2d 869 (Tex. App. 1982); *Miller v. Johnson*, 343 S.E.2d 301 (Va. 1986); *McKernan v. Aasheim*, 687 P.2d 850 (Wash. 1984); *James G. v. Caserta*, 332 S.E.2d 872 (W. Va. 1985); *Beardsley v. Wierdsma*, 650 P.2d 288 (Wyo. 1982).

Las razones principales para esta distinción han sido que se considera que los beneficios emocionales que el niño le provee a sus padres exceden la carga económica que conlleva su crianza y que por razones de política pública no puede decirse que sufren daños los padres por el nacimiento y la crianza de un niño. Otros fundamentos esbozados en la jurisprudencia para apoyar dicha postura son: se promueve la estabilidad emocional de la familia al evitarle al niño el trauma sicológico de no ser querido y haber sido criado con dinero de un tercero; se evitan reclamaciones fraudulentas, y estos daños son especulativos. *Beardsley v. Wierdsma*, supra.

■ Luego de examinar los razonamientos y fundamentos aducidos en la jurisprudencia estatal que apoyan las distintas posiciones, resolvemos que procede una acción de impericia profesional en las circunstancias aquí presentes. En primer lugar, no vemos diferencia entre esta acción y las demás que se instan por mala práctica profesional de la medicina. No existe justificación para exigirle a los médicos que hacen estas operaciones de esterilización un menor grado de cuidado que el requerido a los que realizan otras operaciones. Resolver de otra forma sería concederle una inmunidad total o parcial a estos profesionales.

■ Tampoco consideramos que existan razones de política pública que impidan conceder daños en las circunstancias aquí presentes. De probarse la negligencia y la relación causal, procede compensar por los gastos médicos incurridos en el parto y en las esterilizaciones, las angustias mentales, los sufrimientos físicos, el lucro cesante y demás daños. En cuanto a los costos de manutención y de educación del menor, no es necesario que ahora decidamos si procede compensarlos, pues en el caso de autos no fueron concedidos y los demandantes no recurrieron de esa determinación.

### III

■ Conforme la norma establecida basta indicar que, en casos como el de autos, el promovente tiene que demostrar que el tratamiento del médico demandado fue el que con mayor probabilidad causó el daño y la relación causal. *Rodríguez Crespo v. Hernández*, supra, y casos allí citados.

Aquí la negligencia del médico fue claramente probada por la prueba presentada. El doctor González Jové, al redactar el informe sobre la segunda esterilización (que fue admitido como prueba documental), indicó que al realizar esta cirugía observó que el anillo de falopio izquierdo no estaba comprimiendo el tubo, sino debajo de éste —en los vasos

meso-ováricos— por lo que no se impidió que pudiera ocurrir la fertilización. Del dibujo que hizo el doctor González Jové, también admitido en evidencia, se puede ver claramente dónde fue que el doctor Plá colocó incorrectamente el anillo. Esta prueba demuestra que el recurrente fue negligente al realizar la esterilización por "laparoscopía".

El recurrente intenta rebatir esta prueba. Alega que antes de efectuarse la segunda esterilización se hizo una prueba de tinte en los tubos de falopio que resultó negativa, lo que indica que los tubos estaban obstruidos. No podemos aceptar tal argumento. Primeramente, no nos ha puesto en condición de evaluar su posición, pues no cita la prueba pericial que apoya tal contención ni demuestra que esa prueba de tinte tenga mayor peso que la observación directa del doctor González Jové.

Tampoco hemos encontrado que el examen así practicado —por una enfermera— sea un estudio suficiente para determinar que los tubos de falopio están obstruidos y refutar dicha prueba directa. Véase Benson, *Diagnóstico y Tratamiento Ginecoobstétricos*, 4ta ed., México, Ed. El Manual Moderno, págs. 990–991.

Además, argumentó el recurrente que en casos de esterilización por "laparoscopía" hay un por ciento en que ocurre "la fistulización del área en la que se coloca el anillo la cual permite la fertilización del óvulo" y luego desaparece la fístula. Solicitud de revisión, pág. 8. Este argumento nuevamente choca con la prueba directa de la observación que hizo el doctor González Jové. No se trata de una posibilidad de fistulización del área en que se colocó el anillo, pues según la referida prueba éste se puso debajo del tubo de falopio y, por lo tanto, no se impidió la fertilización del óvulo según ocurre normalmente.

## IV

El segundo señalamiento de error se refiere a la condición de neumotórax espontáneo que tuvo la señora Rosario durante el tercer alumbramiento, que requirió una intervención quirúrgica para corregirla.

Surge del informe médico sobre el tercer parto que, mientras daba a luz, la señora Rosario tenía los síntomas de la condición de neumotórax. Las evaluaciones, las placas y las intervenciones médicas posteriores confirmaron que se trataba de un neumotórax espontáneo en el pulmón derecho. No se indicó la causa del mismo. El tribunal de instancia concluyó que esta condición "sobrevino en el momento de dar a luz", aun cuando reconoció que "[d]e ordinario, un parto no va acompañado de un neumotórax". Apéndice, págs. 41–42. No indicó cuál fue la causa ni la prueba pericial en apoyo a su conclusión de que fue causado por el parto.

En síntesis, el recurrente alega que no hay relación causal entre el neumotórax y la actuación negligente, por lo que debe reducirse la compensación sobre daños físicos y angustias mentales. Los recurridos argumentan que, en términos médicos, el significado de que esta condición es "espontánea" es que no hay un factor específico identificable que la cause. Además, indican que el término "espontáneo" no se puede considerar en su sentido común y corriente ni "dentro del término médico como espontáneo en su etiología". Oposición a la solicitud de revisión, pág. 11. Le asiste la razón al recurrente.

Reiteradamente hemos establecido que la norma sobre relación causal en casos de mala práctica médica exige que de la prueba presentada tiene que surgir que el tratamiento ofrecido por el médico demandado fue el que con mayor probabilidad causó el daño. *Rodríguez Crespo v. Hernández*, supra; *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983).

El neumotórax y, específicamente, el neumotórax espontáneo se definen así:

Chest injury may permit air to enter the pleural space either from within or from without the body. Rupture of trachea, bronchus, or lung as the result of blunt thoracic trauma permits the escape of air into the space from within the body; penetrating injury to the pleura permits the entrance of air into the space from outside the body. The term *spontaneous pneumothorax* is sometimes used to designate the internal variety, that is, it encompasses any pneumothorax arising from any nontraumatic reason other than the introduction of air or gas into the pleural cavity from outside the body. Thus it includes pneumothorax due to closed (nonpenetrating) injury to the chest, and pneumothorax that develops in an apparently healthy and uninjured individual without known cause. Kalish-Williams, *Courtroom Medicine*, Ed. Mathew-Bender, 1975, Vol. II, Sec. 5.11.

Además, se ha indicado sobre esta condición lo siguiente:

It becomes apparent that spontaneous pneumothorax is a rather vague name, yet no better term defining the etiology and pathogenesis has been accepted. The term has become established by common usage, yet it defies strict classification and invites loose interpretation. Spontaneous pneumothorax commonly refers to the subpleural bleb that ruptures for no apparent reason in an otherwise healthy individual. Adler, Marrash and Niguidula, *Spontaneous Neumothorax with a Review of Ninety-Five Cases*, 61 N.Y. State J. Med. 570, 574 (1961).

■ De lo anterior resulta claro que se trata de una condición en que el factor o los factores que la causan no se pueden determinar. Se acepta la espontaneidad como etiología de la enfermedad. En un estudio realizado de personas que sufrieron de neumotórax espontáneo, casi el ochenta por ciento (80%) de éstas estaban descansando o sin esforzarse cuando le sobrevino la condición. Adler, Marrash and Niguidula, *supra*, pág. 573. No hemos encontrado en la prueba documental ni en la sentencia recurrida que se haya estable-

cido que el alumbramiento fue lo que con mayor probabilidad causó el neumotórax. Por lo tanto, incidió el tribunal a quo al conceder daños físicos y mentales causados por dicha condición.

En consecuencia y tomando en cuenta que la corte de instancia, al compensar tales perjuicios, estimó que este padecimiento causó "graves sufrimientos físicos a la señora Rosario", procede reducirle la indemnización por daños físicos y mentales de la madre a $20,000 y a su esposo a $5,000.

## V

Los últimos tres (3) errores apuntados se refieren a la partida concedida a la sociedad de gananciales por ingresos futuros dejados de percibir a causa del tercer embarazo.

La parte recurrida presentó el testimonio del economista Dr. Bartolomé Stipec y un estudio preparado por éste —titulado *Costo de manutención y educación de un hijo durante los primeros veinte y un años de su vida* (Anejo I)— sobre el menoscabo económico que sufrió la familia a causa del nuevo hijo. Se concluye que procede el pago de $73,411.57, los cuales se desglosan en las partidas siguientes: (1) $22,869.66 por ingresos dejados de percibir por la madre durante los primeros cuatro (4) años de vida de la niña, período en que la madre no podía trabajar; (2) $20,987.77 por el costo de cuidar la niña desde los cuatro (4) años hasta los catorce (14) años de edad; (3) $11,365.46 por servicios como ama de casa, y (4) $18,188.68 por menoscabo de oportunidades de empleo y reducción de ingreso al reintegrarse la madre al trabajo. El tribunal de instancia sólo concedió la primera y la cuarta partida. No hubo indemnización por concepto de manutención y educación de la recién nacida.

El recurrente alega, en síntesis, que no procedía indemnización por tales conceptos porque: la señora Rosario no podía trabajar por una condición del riñón flotante y no por el nuevo bebé; el fundamento para estimar estas sumas es

sólo el ingreso devengado en tres (3) meses, y las cuantías y los fundamentos son especulativos.

■ Hay que tener presente, al evaluar indemnizaciones por este concepto, que "el lucro cesante se trata de un *perjuicio* sufrido que consiste en una *ganancia futura frustrada* que con *cierta probabilidad era de esperarse, según el curso normal* ulterior de las cosas, *la realización de cuya ganancia no tiene que ser demostrada con certeza absoluta* por la parte perjudicada . . .". (Énfasis suplido y en el original.) *Escobar Galarza v. Banuchi Pons*, 114 D.P.R. 138, 150–151 (1983), opinión concurrente del Juez Asociado Señor Rebollo López.

■ En *Rodríguez v. Ponce Cement Corp.*, 98 D.P.R. 201, 219 (1969), establecimos:

No hay regla fija para estimar el importe de la disminución en la capacidad productiva; cuando menos se requieren tres determinaciones básicas: (a) la extensión de la mengua en la capacidad productiva, que ordinariamente se establece mediante una comparación de la habilidad para obtener ingresos antes y después del accidente; (b) la determinación de los efectos de la disminución, si transitoria o permanente; y (c) la fijación de la suma que compensa por esta disminución, considerando tanto su extensión como sus efectos, incluyendo la actualización de la pérdida (*present net worth*). No es necesario que la prueba demuestre con precisión matemática los daños causados por este concepto; basta con que se ofrezca una base razonable que permita hacer una determinación prudente, y no hija de la especulación y la conjetura. Véanse, además: *Publio Díaz v. E.L.A.*, 106 D.P.R. 854 (1978); *Velázquez v. Ponce Asphalt*, 113 D.P.R. 39 (1982); *Ruiz Santiago v. E.L.A.*, 116 D.P.R. 306 (1985).

En el informe pericial sobre la estimación de esta partida se tomó como fundamento el salario devengado por la señora Rosario en un empleo anterior y el término —cuatro (4) años— durante el cual temporeramente no podría trabajar por tener que cuidar a la recién nacida. Se calculó dicha

suma a base de su valor actual (*present net worth*), los factores pertinentes para dicho período de tiempo y se trató de establecer el ingreso futuro frustrado de la señora Rosario. H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1986, págs. 474–516.

El examen del estudio del doctor Stipec revela que sus conclusiones finales no están debidamente explicadas. No ofrece fundamento específico para opinar que la demandante no podía trabajar durante los primeros cuatro (4) años del nacimiento de su hija. Estimamos más razonable limitar esta partida a una de dos (2) años. Por esa razón se rebajará esta partida a la suma de $11,934.88.

■ La partida de $18,188.68, por menoscabo de oportunidades de empleo y reducción de ingreso, debe ser totalmente eliminada por especulativa y carente de fundamento en la prueba presentada. La misma parte de la premisa de que al reintegrarse al empleo la madre recibirá $1,584.00 menos al año de lo que hubiera recibido de no haber tenido que ausentarse del mercado laboral. No se ofrece explicación alguna para dicha conclusión. El informe del perito está totalmente huérfano de un fundamento razonable para el Tribunal adoptar tal teoría.

■ Por último, en cuanto a la determinación de hecho del tribunal de instancia sobre la razón de la recurrente para no volver a trabajar, no existe prejuicio, pasión, parcialidad o error manifiesto que justifique nuestra intervención con la apreciación de la prueba. *Velázquez v. Ponce Asphalt*, supra, pág. 50; *Morán Simó v. Gracia Cristóbal*, 106 D.P.R. 155 (1977).

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Rebollo López hace constar que entiende, al igual que el Tribunal, que no hay razón alguna

por qué concederle en relación con estos casos "una inmunidad total o parcial a estos profesionales" en particular. En consecuencia, concurre con el Tribunal en cuanto a que, probada la negligencia del médico al realizar la operación requerídale de esterilización, procede la acción de daños y perjuicios contra éste por algunos de los conceptos por los cuales aquí se reclama. Ello no obstante, disiente por razón de que es del criterio que las cuantías de dinero concedídales a los demandantes son altas. El Juez Presidente Señor Pons Núñez no intervino. La Juez Asociada Señora Naveira de Rodón se inhibió.