EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Marisol Arrieta y Otros<br><br>Demandantes-Recurridos<br><br>v.<br><br>Dr. Alberto de la Vega y Otros<br><br>Demandados-Peticionarios | Certiorari<br><br>2005 TSPR 126<br><br>165 DPR _____ |

Número del Caso: CC-2004-909

Fecha: 9 de septiembre de 2005

Tribunal de Circuito de Apelaciones:

                Circuito Regional de San Juan Panel I

Juez Ponente:

                Hon. Pierre E. Vivoni del Valle

Abogado de la Parte Recurrida:

                Lcdo. Juan Carlos Negrón Rodríguez

Abogado de la Parte Peticionaria:

                Lcdo. Igor J.Domínguez
                Lcda. Doris Quiñones Tridas
                Lcda. Nanette Alomar Camacho

Materia: Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Marisol Arrieta y Otros

   Demandantes-Recurridos

                                             CC-2004-909

       v.

Dr. Alberto de la Vega y Otros

   Demandados-Peticionarios

PER CURIAM

San Juan, Puerto Rico, a 9 de septiembre de 2005

Los peticionarios, doctores de profesión, nos solicitaron que revisáramos una sentencia dictada por el Tribunal de Apelaciones donde se concluyó que éstos habían incurrido en impericia médica en el tratamiento postoperatorio de la demandante. Al así concluir, el foro apelativo intermedio revocó la determinación en contrario del Tribunal de Primera Instancia.

El tribunal apelativo determinó que los peticionarios, Dr. Alberto de la Vega y la Dra. Daisy J. Vázquez, le perforaron la vejiga a la demandante al efectuarle una esterilización con

laparascopio y negligentemente tardaron en diagnosticar la perforación, lo que tuvo como resultado que ésta padeciera posteriormente de endometriosis y que tuviera que someterse a una histerectomía.

Evaluado el recurso a la luz de la prueba presentada en el tribunal de instancia, revocamos el dictamen del Tribunal de Apelaciones. Del expediente se desprende que los doctores emplearon su mejor juicio clínico en el tratamiento ofrecido a la demandante con posterioridad a su esterilización por lo que no incurrieron en mala práctica médica.

## I

El Dr. Alberto de la Vega es especialista en obstetricia y ginecología y tiene una sub-especialidad en sonografía. Tiene constituida una sociedad profesional para la práctica de la obstetricia y ginecología con la Dra. Daisy Vázquez. Los doctores de la Vega y Vázquez tienen privilegios en el Hospital Ashford Community Presbyterian y ambos tienen los "boards" de su especialidad.

La demandante, Marisol Arrieta, había sido paciente del doctor de la Vega desde el año 1992, cuando éste la atendió durante su primer parto. Parto, que presentó complicaciones por presión alta crónica de la señora Arrieta que requirió que se le efectuase una cesárea. Luego de su segundo embarazo, en el 1995, la señora Arrieta discutió con el doctor de la Vega en varias ocasiones la

posibilidad de someterse a una operación de esterilización. En mayo de 1996, en una visita a su médico, se discutió el proceso de esterilización y los distintos métodos disponibles para ello.

Su médico le recomendó que se hiciera la esterilización con laparoscopio conocida como laparoscopia. El doctor de la Vega le explicó a la señora Arrieta la naturaleza de la intervención, indicándole la forma en que se realizaba la misma y que ésta era ambulatoria, lo cual le permitiría regresar a su casa el mismo día.[1] Además, del expediente médico y de los testimonios de ambas partes se estableció que la señora Arrieta firmó una hoja donde consentía a la esterilización y admitía conocer la naturaleza de la intervención, así como los riesgos inherentes de ésta, incluyendo, entre otros, riesgo de infección y **perforación de órganos**.[2]

El 11 de julio de 1996, en horas de la tarde, los doctores de la Vega y Vázquez le realizaron la laparoscopia a la señora Arrieta en el Hospital Ashford. Se le administró anestesia general. Como parte del proceso

---

[1] La laparoscopia es un proceso en el que se inyecta bióxido de carbono u otro gas en el vientre, que ocasiona la distensión y separación de los órganos para ayudar a detectar los órganos reproductores. Se realiza una pequeña incisión abdominal a través de la cual se introduce el laparoscopio. Se ilumina el interior del abdomen y con un instrumento que asemeja garfios se agarran los tubos de falopio, se colocan unos anillos que ligan y comprimen los tubos para evitar que pasen los óvulos. Luego de separar los tubos se sacan los instrumentos y el gas. *Torres Ortiz v. Plá,* 123 D.P.R. 637, 640 (1989).

[2] Apéndice del recurso de *certiorari*, pág. 441.

preoperatorio el doctor de la Vega le insertó una sonda ("folley") para vaciarle la vejiga.[3] En la noche de ese mismo día fue dada de alta del hospital por no tener ninguna complicación. Se le instruyó, que de tener algún problema se comunicara con los médicos de inmediato.[4]

Al día siguiente, el esposo de la señora Arrieta llamó a la oficina de los médicos para informar que su esposa estaba adolorida. El doctor de la Vega le instruyó que fueran a su oficina. **La paciente tenía dolor a la palpación abdominal y vómitos.**[5] **La señora Arrieta le indicó que orinaba normalmente.**[6] Los médicos descartaron abdomen quirúrgico (abdomen operable), ya que la paciente no tenía rebotes[7] ni "guardings"[8] a la palpación.

El examen reveló distensión abdominal (abdomen hinchado), por lo que sospecharon un posible diagnóstico de íleo paralítico (parálisis de los intestinos), y ordenaron que fuese recluida de inmediato para evaluación y mantenerla bajo observación. Le realizaron pruebas de

---

[3] Véase en el apéndice, *Hoja de Sala de Operaciones-Proceso Operatorio del Hospital Ashford.*
[4] Exposición narrativa, 4 de mayo de 2000, pág. 11.
[5] *Id.,* pág. 19.
[6] Apéndice del recurso de certiorari, pág. 252.
[7] El "rebote" se define como contracción brusca del músculo después de un periodo de relajación, observado con frecuencia en enfermedades en las que se pierden los reflejos inhibidores. Diccionario Mosby, *Medicina, Enfermería y Ciencias de la Salud*, Ed. Elsevier Science, 2003, Tomo 2, pág. 1348. Es el dolor que se produce cuando se presiona sobre la barriga provocando un movimiento súbito de los intestinos. Véase Exposición Narrativa, *supra, nota* 4, pág. 18.
[8] El "guarding" se define como posición protectiva de alguien que tiene tanto dolor, que no te permite tocarlo. *Id.*

orina, de sangre, radiografía del abdomen (KUB) y sonografía pélvica. Se le ordenaron pruebas de amilasa y lipasa, enzimas que detectan la posibilidad de pancreatitis. También se le administró toradol (para el dolor), el antibiótico mefoxin y fernergán (para los vómitos).[9] No reportó fiebre.

Al otro día, 13 de julio de 1996 a las 10:45 a.m., la señora Arrieta fue evaluada por la doctora Vázquez. La paciente le indicó que se "sentía mejor", aunque tenía gases y dolor abdominal. La doctora examinó los resultados de laboratorio que reflejaban que el contaje de glóbulos blancos, el BUN ("urea nitrogenada") y la creatinina[10] estaban elevados. Determinó que la amilasa y la lipasa estaban normales, descartando así un diagnóstico de pancreatitis. La doctora Vázquez le hizo un examen físico donde detectó sonidos hiperkinéticos de los intestinos (movimiento de intestinos). Del expediente médico se desprende que la paciente no reflejaba rebotes ni "guardings" a la palpación abdominal. Con esos hallazgos, la doctora corroboró que la paciente no tenía abdomen agudo. La doctora Vázquez decidió continuar con el mismo tratamiento (dosis de toradol, fenergán, líquido intravenoso de 150cc por hora). Ordenó una muestra de

---

[9] Id., págs. 24-25.
[10] Tanto el BUN como la creatinina son indicadores de la función renal. Niveles bajos pueden indicar que no se come suficiente proteína, enfermedad del hígado o daños en los riñones. Niveles altos pueden indicar daños en los riñones en el caso de la creatinina o ingesta excesiva de proteínas en el caso del BUN.

orina y que le notificaran los resultados del KUB una vez estuvieran listos.[11]

El 14 de julio de 1996, a las 9:30 de la mañana, el doctor de la Vega visitó a la paciente. La paciente le indicó que tenía gases y dolor abdominal. El KUB efectuado detectó aire en el abdomen lo que el galeno describió en su notas en el récord médico, como "algo esperado después de una laparoscopia." **La placa no reflejó presencia de íleo paralítico ni mostraba presencia alguna de líquido en el abdomen.** Los resultados de laboratorio de la prueba de sangre reflejaron niveles en la urea nitrogenada y creatinina por encima de lo normal, mientras que los glóbulos blancos disminuyeron. El récord reflejaba que le había dado un poco de fiebre el día anterior y se detectó sangre en la orina. Ante ese cuadro, el doctor de la Vega consideró la posibilidad que la paciente estuviese padeciendo de pielonefritis (inflamación renal) y decidió consultar a un especialista en medicina interna.

A eso de las 11:00 a.m., el doctor de la Vega reevaluó a la paciente. Ese día le pasó una sonda y se le removió 2,800cc de orina, por lo que se hizo un diagnóstico de retención urinaria por atonía de vejiga (ausencia de tono muscular o debilidad de la vejiga). **Más adelante, unas nuevas pruebas de laboratorio demostraron una normalización de la creatinina y úrea en la sangre.** El doctor de la Vega

---

[11] Ese mismo día, a las 4:50 p.m., la doctora Vázquez volvió a reevaluar a la paciente y descontinuó el toradol. *Id.,* págs. 136-137.

ordenó que se mantuviera un récord de ingestión y eliminación de la paciente.

El 15 de julio de 1996 la paciente indicó sentirse mucho mejor. Se le removió la sonda por recomendación del internista consultado.[12] Ese mismo día, la paciente tuvo recurrencia de síntomas al removérsele la sonda. Se mantuvo el mismo diagnóstico de atonía de la vejiga con insuficiencia aguda obstructiva, por lo que se volvió a insertar la sonda con drenaje continuo. Los resultados del sonograma pélvico fueron reportados como negativos. Esta prueba detectaría la presencia de líquido en el abdomen. Por instrucciones del internista se repitieron los exámenes de sangre cuyos resultados demostraron mejoría.

El 16 de julio de 1996, la paciente indicó que no tenía deseos de orinar y el doctor de la Vega decidió consultar con un urólogo. Se refirió el caso al Dr. Roberto Canto. El doctor Canto la evaluó ese mismo día en la tarde y ordenó un cistograma --estudio que se utiliza para verificar perforaciones de vejiga-- el cual se llevó a cabo al día siguiente. El estudio reflejó que había una pequeña perforación en la parte superior de la vejiga que

---

[12] El doctor López Dávila, internista, también diagnósticó "retención urinaria aguda con insuficiencia aguda renal obstructiva". Exposición narrativa, *supra*, nota 4, pág. 35. La doctora Vázquez la reevaluó ese día y ordenó que le pusieran nuevamente la sonda de forma intermitente. Mas adelante, el internista ordenó que le quitaran la sonda y le hicieran un cultivo de orina.

ocasionaba un pequeño derrame de contrataste (orina) hacia la cavidad peritoneal.[13]

El urólogo discutió las alternativas de tratamiento con la paciente y su esposo. El doctor Canto recomendó que continuara con la sonda con drenaje continuo y no intervenir quirúrgicamente toda vez que la perforación de la vejiga era pequeña y sanaría sola. Los esposos acogieron la recomendación de tratamiento del doctor y la paciente continuó mejorando. El 18 de julio de 1996 la señora Arrieta fue dada de alta y continuó utilizando la sonda como drenaje urinario por un periodo de aproximadamente 10 días adicionales.[14] **Estudios realizados en la evaluación de seguimiento demostraron que el defecto en la vejiga había sellado en su totalidad.[15] No se requirió tratamiento ulterior.**

Meses más tarde, en octubre de 1996, la señora Arrieta comenzó a experimentar dolores pélvicos. En esta ocasión acudió al Hospital San Pablo donde fue atendida por el doctor José Bermúdez. Éste le diagnosticó inflamación pélvica e infección de orina. Fue hospitalizada por una semana. Como parte del tratamiento que recibió se le drenó la cavidad abdominal mediante el proceso de paracentesis

---

[13] Apéndice del recurso de *certiorari*, pág. 271.
[14] Exposición narrativa, 3 de mayo de 2000, pág. 35.
[15] El Dr. Roberto Canto le hizo otro cistograma de seguimiento a la paciente, que demostró que la perforación había sanado. *Id.*

guiada con ultrasonido.[16] Un estudio citopatológico reportó sangre y células de inflamación aguda.[17] Se le diagnosticó "Pelvis Inflamatory Disease" y fue dada de alta una semana más tarde.

El primero de noviembre de 1996 fue hospitalizada nuevamente en esta ocasión por un periodo de 17 días. Fue atendida por el doctor Bermúdez quien le recomendó realizarse una laparoscopia exploratoria. Los hallazgos de esa intervención confirmaron el diagnóstico de inflamación pélvica. Se le hizo una biopsia del endometrio que reveló inflamación crónica. No se le diagnosticó endometriosis.

Posteriormente, la paciente continuó quejándose de dolores abdominales y fue hospitalizada por tercera vez en el Hospital San Pablo. Le realizaron varios estudios, cistogramas y tomografías computadorizadas que resultaron negativos.[18] Se le volvió a hacer una paracentesis y le removieron líquido el cual reveló, una vez más, presencia de células inflamatorias.[19] El 15 de enero de 1997 y en vista de que continuaba con los dolores abdominales, el doctor Bermúdez le realizó una histerectomía. Se le removió también el apéndice y un quiste en el ovario

---

[16] Procedimiento consistente en extraer líquido de una cavidad corporal mediante una incisión que se hace en el vientre.

[17] Se aspiraron 40cc de líquido color ámbar del abdomen. Véase, apéndice del recurso de *certiorari*, pág. 274.

[18] Los estudios no reflejaron patología urinaria y las pruebas de función renal (BUN y creatinina) resultaron normales.

[19] La señora Arrieta es hospitalizada el 30 de diciembre de 1996 por cuatro días.

derecho. Además, se le cauterizó el endometrio en el ovario izquierdo.[20] Las pruebas patológicas postoperatorias confirmaron que la paciente sufría de endometriosis en uno de los ovarios.[21] Luego de la histerectomía dejó de sufrir los dolores que la aquejaban.

El 10 de julio de 1997, la señora Arrieta y su esposo Manuel José Catinchi Balasquide, por ellos y en representación de la sociedad legal de gananciales compuesta por ambos, y en representación de sus dos hijos menores de edad, así como del padre y la madre de la señora Arrieta, presentaron demanda en daños y perjuicios contra el doctor de la Vega, la doctora Vázquez, la sociedad profesional compuesta por ambos, el Ashford Presbyterian Community Hospital y otros.[22]

En octubre de 1997 el doctor de la Vega contestó la demanda negando las alegaciones. Una semana más tarde, la doctora Vázquez hizo lo propio. En julio de 1998, la sociedad profesional constituida por ambos médicos contestó la demanda, adoptando las alegaciones de cada uno de los doctores en sus contestaciones individuales.

En mayo de 2000 se llevó a cabo el juicio en este caso. Testificaron en el mismo los demandantes y su perito el Dr. Vincent W. Masters, ginecólogo-obstetra. El doctor Masters tiene un entrenamiento en laparoscopia de tres días

---

[20] Cabe señalar que en esta ocasión también sufrió una perforación de vejiga.

[21] Apéndice del recurso de *certiorari*, págs. 282.

[22] Posteriormente, los demandantes transaron su reclamación con el Ashford Presbyterian Community Hospital.

que tomó en Phoenix en el año 1972. Su última intervención utilizando este procedimiento fue en el año 1975.

Por la parte demandada testificaron los doctores demandados y su perito el doctor Héctor Rosario. El doctor Rosario es ginecólogo-obstetra y profesor en el Recinto de Ciencias Médicas de la Universidad de Puerto Rico y ha realizado sobre 2,500 laparascopias. Como prueba documental, se presentaron los expedientes médicos de los doctores de la Vega y Vázquez, así como del Hospital Ashford Presbyteran; así como de las hospitalizaciones de la señora Arrieta en el Hospital San Pablo.

Luego de aquilatar la prueba, el Tribunal de Primera Instancia dictó sentencia desestimando la demanda. Señaló que los demandantes no rebatieron la presunción de corrección que cobija a los médicos. En síntesis, determinó que la señora Arrieta conocía la posibilidad de una perforación de órganos en la laparoscopia y que el mero hecho de que haya surgido una complicación en la cirugía no hacía del procedimiento uno negligente.[23] Adujo que la prueba no estableció una relación causal entre el tratamiento postoperatorio realizado por los doctores de la Vega y Vázquez y los dolores abdominales que culminaron con el hallazgo de endometriosis e inflamación pélvica, lo cual causó que le extirparan varios órganos a la paciente. El

---

[23] Sentencia del Tribunal de Primera Instancia, apéndice del recurso de *certiorari*, págs. 93-110.

tribunal de instancia le dio entera credibilidad al testimonio del perito de la parte demandada.

Inconformes, los demandantes acudieron al Tribunal de Apelaciones. El tribunal apelativo revocó la sentencia apelada. El foro apelativo basó su determinación, esencialmente, en las declaraciones del perito de los demandantes. Concluyó que los doctores de la Vega y Vázquez incurrieron en mala práctica médica en su diagnóstico postoperatorio al no detectar la perforación en la vejiga a pesar que ello era un riesgo inherente a la laparoscopia. Indicó que según la prueba desfilada, el riesgo de una perforación en la vejiga se intensificaba cuando una mujer había tenido una cesárea ya que la vejiga se puede mover de lugar. Determinó que los doctores fueron negligentes al no vaciar la vejiga de la señora Arrieta antes de la laparoscopia y por esperar cinco días antes de referirla a un urólogo.

No conforme con la determinación del foro apelativo, los doctores de la Vega y Vázquez, acudieron ante este Tribunal solicitando que se revocase al foro apelativo intermedio. Señalaron como error lo siguiente:

> Erró el Tribunal de Circuito de Apelaciones (sic) al determinar que medió impericia médica por parte de los doctores de la Vega y Vázquez, en ausencia de prueba que rebata la presunción de corrección que cobija a los médicos.

> Erró el Tribunal del Circuito de Apelaciones (sic) al concluir que la paciente no fue debidamente informada de los riesgos de la laparoscopia, en ausencia de controversia o reclamo sobre ello.

Erró el Tribunal de Circuito de Apelaciones (sic) al determinar que [sic] la existencia de relación causal en el caso de autos, en ausencia de prueba que sustente dicha conclusión.

Expedimos el auto. Contando con la comparecencia de ambas partes procedemos a resolver.

## II

En una acción en daños y perjuicios por impericia médica instada bajo el Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141, el demandante tiene que demostrar primero, cuáles son las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas; segundo, demostrar que el demandado incumplió con estas normas en el tratamiento del paciente; y, tercero, que esto fue la causa de la lesión sufrida por el paciente. *Medina Santiago v. Vélez*, 120 D.P.R. 380, 385 (1988).

Conforme la norma mínima de cuidado médico exigible, hemos requerido que el médico brinde a sus pacientes aquella atención médica que a la luz de los modernos medios de comunicación y enseñanza y, conforme al estado de conocimiento de la ciencia y práctica prevaleciente de la medicina, satisfaga las exigencias generalmente reconocidas por la propia profesión médica. *López Delgado v. Cañizares*, res. 5 de octubre de 2004, 162 D.P.R.____, 2004 T.S.P.R. 160; *Sepúlveda de Arrieta v. Barreto*, 137 D.P.R. 735, 759 (1994); *Marti Méndez v. Abreu Feshold*, 143 D.P.R. 520 (1997); *Castro Ortiz v. Municipio de Carolina*, 134 D.P.R.

783 (1993); *Ramos Escobales v. García González*, 134 D.P.R. 969 (1993); *Torres Ortiz v. Plá*, 123 D.P.R. 637 (1989); *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Ríos Ruiz v. Mark,* 119 D.P.R. 816, 820 (1987); *Pérez Cruz v. Hospital La Concepción*, 115 D.P.R. 721 (1984); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *López v. Hospital Presbiteriano, Inc.*, 107 D.P.R. 197 (1978); *Sáez v. Municipio de Ponce*, 84 D.P.R. 535 (1962).

Todo médico posee amplia discreción para formular juicio profesional en cuanto al diagnóstico y tratamiento médico. El diagnóstico de una enfermedad es una etapa crítica en la atención al paciente toda vez que a partir de los resultados del mismo se determina o elabora el tratamiento a seguir. Es el primer paso antes de emprender el tratamiento adecuado. R. Vázquez Ferreyra, *Daños y perjuicios en el ejercicio de la medicina*, Ed. Hammurabi, Buenos Aires, Argentina, 2da. ed. 2002, pág. 106-107. Hemos reconocido que al médico le asiste una presunción de haber ejercido un grado razonable de cuidado y haber ofrecido un tratamiento adecuado. *Crespo v. Hernández*, 121 D.P.R. 639 (1988). Para rebatir esta presunción, la parte demandante no puede descansar en una mera posibilidad de que el daño se debió al incumplimiento por parte del médico de su obligación profesional. El hecho de que un paciente haya sufrido un daño o que el diagnóstico haya fracasado o que el tratamiento no haya tenido éxito no crea la presunción de negligencia por parte del facultativo médico.

Un médico no puede garantizar un resultado favorable en toda intervención. *Ramos Robles v. García Vicario, supra; Rodríguez Crespo v. Hernández, supra; Medina Santiago v. Vélez, supra; Sáez v. Municipio de Ponce*, 84 D.P.R. 535 (1962).

Partiendo de un enfoque justo y realista se admite que en la profesión médica, puede haber **errores razonables de juicio**. *Morales v. Hospital Matilde Brenes*, 102 D.P.R. 188 (1974). El criterio de razonabilidad, supone sin embargo, que el médico efectúe todos los exámenes necesarios para llegar a un diagnóstico correcto. *Morales v. Hospital Matilde Brenes, supra.* En *Oliveros v. Abreu,* 101 D.P.R. 209 (1973), señalamos que el error de juicio en el diagnóstico es una defensa cuando está presente una de las siguientes circunstancias: 1) existe una duda razonable sobre la condición o enfermedad del paciente; 2) las autoridades médicas reconocidas están divididas en cuanto a cual debe ser el procedimiento de diagnóstico a seguirse; o 3) el diagnóstico se hace después de un esfuerzo concienzudo del médico para enterarse de los síntomas y condición del paciente.

Por tanto, **el médico tiene el deber de hacer un esfuerzo para enterarse de los síntomas y de la condición del paciente, agotando los medios de diagnóstico diferencial que el estado del conocimiento pone a**

**disposición de la profesión médica.**[24] Véase, H. Brau del Toro, *Los Daños y Perjuicios Extracontractuales en Puerto Rico*, Publicaciones JTS, Inc., Segunda Edición, 1986, Vol. I, pág. 248. La doctrina de diagnóstico diferencial está basada en la exigencia de un procedimiento para distinguir entre posibles padecimientos que requieren tratamientos diferentes y específicos. *Lozada v. E.L.A.*, 116 D.P.R. 202, 217 (1985).

Finalmente, cuando se trata de evaluar las determinaciones sobre impericia médica que están fundamentadas en la prueba pericial y documental ofrecida, este Tribunal está en igual posición para evaluarlas y hacer sus propias conclusiones. *López v. Cañizares, supra; Ramos Robles v. García, supra; Ríos Ruiz v. Mark, supra; Rodríguez Cancel v. AEE,* 116 D.P.R. 443 (1985); *Cruz v. Centro Médico, supra.*

Procede entonces aplicar la normativa previamente reseñada a los hechos del caso de epígrafe.

## III

Como cuestión inicial, debemos evaluar si la tardanza de los doctores recurridos en detectar la perforación en la vejiga de la señora Arrieta fue una actuación negligente a la luz de los hechos de este caso. Si esa pregunta se contesta en la afirmativa, entonces y sólo entonces, hay

---

[24] El diagnóstico diferencial es el diagnóstico de un estado patológico cuyos signos y síntomas están compartidos por otros estados patológicos semejantes. *Hernández Rivera v. Municipio de Bayamón*, 135 D.P.R. 901, 903 (1994).

que analizar si existe un nexo causal entre el acto negligente y el daño alegado, a saber, la operación de histerectomía a que se tuvo que someter la recurrida. Si concluimos que no se probó que los doctores demandados incurrieran en mala práctica médica por error en el diagnóstico postoperatorio ahí concluye nuestro análisis pues no habría actuación negligente alguna.

Hay que señalar primeramente que no hay controversia sobre el hecho que la señora Arrieta fue informada de los posibles riegos de una laparoscopia, incluyendo la perforación de órganos. **Ambas partes están contestes que a la señora Arrieta se le informó y así firmó un consentimiento informado, de los riesgos que podía enfrentar en este tipo de cirugía debido al tipo de instrumentos que se utilizaban en el mismo.** Se le orientó además sobre el procedimiento quirúrgico y la naturaleza del mismo. Procede entonces evaluar cuál fue la sintomatología de la señora Arrieta luego de su laparoscopia.

Del récord del caso se desprende que la señora Arrieta presentaba síntomas confusos los cuales podían dar margen a múltiples diagnósticos; incluyendo claro está, el de perforación de la vejiga. Entre los síntomas que ésta presentó durante los días posteriores a su operación se encuentran los siguientes: vómitos, dolor abdominal, gases, niveles elevados de glóbulos blancos, de BUN y de la creatinina, aire en el abdomen, sangre en la orina y,

dificultad al orinar. Valga señalar que ésta no tuvo todos estos síntomas a la vez sino que variaron de día a día. De otro lado, algunos de estos síntomas, independientes o en combinación, pueden sugerir las siguientes condiciones: vejiga perforada, abdomen agudo, íleo paralítico, pancreatitis e infección renal. Véase, Diccionario Mosby, *Medicina, Enfermería y Ciencias de la Salud*, Ed. Elsevier Science, 2003, Tomo 1, págs. 2, 841; Tomo 2, págs. 1159, 1381; Gordy & Gray, *Attorney's Textbook of Medicine*, Ed. Mathew Bender & Company, 2004, Tomo 17, pág. 280-96.

Cabe señalar que los síntomas de una perforación de vejiga **no son específicos y un padecimiento de uno de ello por sí solo, no es determinante.** Gordy & Gray, *op. cit*, pág. 285B-13. Algunos de los síntomas identificados con esta condición son los siguientes: dolor abdominal, incapacidad de orinar, presencia de sangre en la orina, ausencia de peristaltismo intestinal (íleo paralítico), presencia de sangre en la cavidad externa de la uretra ("urethral meatus") y presencia de líquido o aire en el abdomen. *Id.*, págs. 285B-14-285B-16. Conforme se señaló anteriormente, la señora Arrieta reflejó varios de estos síntomas en los días postoperatorios.

Del récord del caso se desprende que los doctores demandados comenzaron a tratar a la demandante inmediatamente y fueron descartando distintas condiciones a medida que la sintomatología de la señora Arrieta variaba.

Es decir, a la señora Arrieta se le hicieron diagnósticos diferenciales de enfermedades o padecimientos probables.

Como primer paso, los médicos realizaron una evaluación de los dolores abdominales de la paciente para descartar un abdomen agudo que conlleva la probabilidad de una cirugía de emergencia.[25] Posteriormente determinaron la posibilidad de íleo paralítico, un diagnóstico que era probable ante la reciente cirugía abdominal y los vómitos. Adviértase que el íleo paralítico también podía ser un síntoma de perforación de vejiga.[26] Sin embargo, este diagnóstico fue descartado luego de las pruebas radiológicas y de los exámenes de los doctores. Igualmente, en forma paralela a dichos diagnósticos, realizaron pruebas para diagnosticar pancreatitis, enfermedad que también tiene síntomas de dolor abdominal, vómitos y fiebre.[27]

También se pasó prueba en el juicio, y ambos peritos estuvieron de acuerdo, que luego de una laparoscopia no es inusual que la paciente retuviera aire en el abdomen, especialmente durante las primeras 48 horas después de la operación. De la prueba se estableció que el examen radiológico se realizó cuando habían pasado 43 horas. Ello fue corroborado con las notas de progreso del doctor de la Vega y por las autoridades médicas presentadas en

---

[25] Diccionario Mosby, *supra*, nota 7, Tomo 1, pág. 2.
[26] *Id.*, pág. 841.
[27] *Id.*, Tomo 2, pág. 1159.

evidencia.[28]   Por lo tanto, la presencia de aire en el abdomen en el momento que fue detectado no era conclusiva de la perforación de la vejiga.

Surge también del récord médico y los reportes de enfermería que no fue sino hasta el día 13 de julio (segundo día postoperatorio) que la paciente reflejó problemas con la orina.

De otra parte, los indicadores de función renal (BUN y creatinina) indicaban que había algo anormal en los riñones.   Una vez el doctor de la Vega analizó dichos estudios y al mismo tiempo detectó sangre en la orina y fiebre, hizo un diagnóstico preliminar de pielonefritis por lo que consultó con un especialista en medina interna.   No podemos concluir que esa determinación fuera irrazonable. **Nótese que hasta ese momento no había surgido problemas con la orina, no había líquido en el abdomen, el aire en el abdomen estaba bajo los parámetros normales y se había descartado el íleo paralítico.**

En cuanto al tratamiento con la sonda, el doctor de la Vega consultó con un internista, el cual concluyó, según los síntomas y análisis médicos de la paciente, que podía

---

[28] El perito de los demandantes testificó que "no es normal" que quede aire en el abdomen luego de 48 horas de la operación. Por su parte, el perito de los demandados indicó que el aire puede durar "más de tres días en el abdomen". El doctor Wade citó el libro de laparoscopia de Richard Soderstrom, el cual discute los **síntomas de una perforación de intestino**, mientras que el doctor Rosario utilizó el libro "Radiology Diagnostic Intervention." Véase, Exposición Narrativa, 3 de mayo de 2000, pág. 24; 9 de noviembre de 2000, pág. 26.

tener retención urinaria por atonía de vejiga. Lo cierto es que este tratamiento ayudó a mantener la vejiga de Arrieta vacía y las pruebas de laboratorio demostraron mejoría inmediatamente.

Finalmente, hay que indicar que el tratamiento que llevó a cabo el urólogo para sellar la perforación de la vejiga era el mismo tratamiento que había comenzado el doctor de la Vega el día 14 de julio.

En general, de los autos se evidenció que los médicos no abandonaron la paciente, realizaron diagnósticos diferenciales --según su juicio médico razonable a la luz de los hechos del caso-- y consultaron con especialistas para atender a la señora Arrieta. Los médicos estuvieron alertas a los cambios acaecidos en la condición de la señora Arrieta mientras ésta estuvo recluida.

Ciertamente no hay duda que erraron en diagnosticar correctamente la condición de la señora Arrieta. Entendemos sin embargo, que éste fue un error de juicio razonable de parte de los doctores codemandados a la luz de los hechos en este caso. Éstos hicieron esfuerzos concienzudos para detectar la condición que aquejaba a la señora Arrieta, descartando diagnósticos posibles a la luz de la patología que reflejaba. En el pasado hemos indicado que los médicos tienen amplia discreción para establecer su diagnóstico y diseñar el tratamiento correspondiente siempre y cuando ello se efectúe de forma razonable. Nada

hay en el récord de este caso que requiera que nos apartemos de dicha norma.

Concluimos, a la luz de lo anterior, que los doctores de la Vega y Vázquez no incurrieron en negligencia en el diagnóstico y tratamiento postoperatorio de la Sra. Marisol Arrieta. Por no haber encontrado negligencia de partes de los doctores demandados, no entraremos a discutir la alegación de nexo causal.

**IV**

Por los fundamentos anteriormente expuestos, los cuales incorporamos, revocamos la sentencia emitida por el Tribunal de Apelaciones y se confirma la sentencia del Tribunal de Primera Instancia, desestimando la demanda instada contra los doctores Alberto de la Vega y Daisy Vázquez.

Se dictará sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Marisol Arrieta y Otros

   Demandantes-Recurridos


       v.                              CC-2004-909

Dr. Alberto de la Vega y Otros

   Demandados-Peticionarios


SENTENCIA

San Juan, Puerto Rico, a 9 de septiembre de 2005

    Por los fundamentos expuesto en la Opinión Per Curiam que antecede, los cuales se incorporan íntegramente a la presente, revocamos la sentencia emitida por el Tribunal de Apelaciones y se confirma la sentencia del Tribunal de Primera Instancia, desestimando la demanda instada contra los doctores Alberto de la Vega y Daisy Vázquez

    Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri no intervino.


               Aida Ileana Oquendo Graulau
               Secretaria del Tribunal Supremo