Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| MARÍA LUISA DE LLEGUAS Y OTROS<br><br>Parte Apelante<br><br>v.<br><br>DR. LUIS RODRÍGUEZ RIVERA, DR. DANIEL RUIZ SOLER, SIMED COMO SUS ASEGURADORAS<br><br>Parte Apelada | TA2025AP00198 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Ponce<br><br>Caso núm.:<br>J DP2009-0313<br><br>Sobre:<br>Impericia Médica Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Rivera Marchand, la Juez Boria Vizcarrondo y el Juez Robles Adorno.[1]

Robles Adorno, Juez Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de abril de 2026.

El 2 de agosto de 2025, la señora María Luisa de Lleguas y los señores Edmundo, Carmen Milagros y Miriam García de Lleguas (en conjunto, la parte apelante) instaron un recurso de *Apelación* en el que solicitaron que revoquemos la *Sentencia Nun Pro Tunc* emitida el 10 de julio de 2025, por el Tribunal de Primera Instancia Sala Superior de Ponce (TPI o foro primario).[2] En el aludido dictamen, el TPI declaró No Ha Lugar la causa de acción por daños y perjuicios e impericia médica presentada por la parte apelante.

Por los fundamentos que exponemos a continuación, confirmamos, en parte, y revocamos, en parte, la *Sentencia* apelada.

**I.**

El caso de epígrafe tuvo su origen el 17 de junio de 2009, cuando la parte apelante presentó una *Demanda* en contra del Hospital San Cristóbal (el Hospital San Cristóbal), la doctora Glenda

---

[1] Véase OATA-2025-170 del 3 de septiembre de 2025 en la que se designa al Juez Robles Adorno en sustitución de la Jueza Mateu Meléndez.
[2] Entrada Núm. 1 del caso TA2025AP00198 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC), Apéndice A, págs. 2-92.

Rodríguez Zayas (doctora Rodríguez Zayas), el doctor Luis A. Rodríguez Rivera (doctor Rodríguez Rivera) y la Corporación del Fondo del Seguro del Estado (CFSE).[3] En síntesis, expuso que, el 17 de julio de 2008, el señor Geraldo García de Lleguas (señor García de Lleguas) fue trasladado del Hospital San Cristóbal, en Ponce, luego de sufrir un accidente mientras laboraba. En esa línea, indicó que, el doctor Rodríguez Rivera recibió al señor García de Lleguas en la sala de emergencias, en donde se le realizó una radiografía que reveló un diagnóstico de espasmo cervical. Añadió que, ese mismo día, el doctor Rodríguez Rivera le administró al señor García de Lleguas medicamentos para espasmos musculares y le otorgó el alta.

Asimismo, la parte apelante esgrimió que el 20 y 23 de julio de 2008 el señor García de Lleguas regresó al Hospital San Cristóbal debido a que persistía el dolor severo en el área del cuello y cabeza que limitaba su movilidad. Alegó que, en ambas ocasiones lo atendió el doctor Rodríguez Rivera, quien se abstuvo de realizarle un estudio de MRI, a pesar de estar disponible en el Hospital San Cristóbal y, en cambio, le instruyó que acudiera a la CFSE en Ponce. La parte apelante manifestó que, en la CFSE también lo diagnosticaron con espasmos musculares, le recetaron medicamentos y no le realizaron estudios adicionales.

Surge de la *Demanda* que, el 28 de julio de 2008, el señor García de Lleguas acudió a la sala de emergencias del Hospital San Lucas en donde le realizaron un MRI que reflejó un absceso epidural a nivel C2-C3. Sin embargo, desafortunadamente, la parte apelante indicó que el 29 de julio de 2008, el señor García de Lleguas falleció a causa de una sepsis relacionada al absceso epidural que no fue atendido a tiempo. Consecuentemente, adujo que, la parte apelada debía responder por los daños y perjuicios sufridos a causa de la

---

[3] *Íd.*, Apéndice A, págs. 267-272.

muerte del señor García de Lleguas. Por ende, la parte apelante solicitó una indemnización global de un millón trescientos mil dólares ($1,300,000.00).

El 30 de marzo de 2010, el doctor Rodríguez Rivera radicó su *Contestación a Demanda Enmendada.*[4] Igualmente, el 7 de abril de 2010, el Hospital San Cristóbal presentó su *Contestación a Demanda Enmendada.*[5] Todos rechazaron, en su mayoría, las imputaciones de negligencia efectuadas en su contra.

Así las cosas, el 3 de diciembre de 2010, la parte apelante radicó una *Demanda Enmendada* en la que incluyó como parte codemandada a Saint Lukes Memorial (Hospital San Lucas) y al doctor Ruiz Soler. En lo pertinente, adujo que, las omisiones y actuaciones del Hospital San Lucas y el doctor Ruiz Soler contribuyeron a la muerte del señor García de Lleguas.

El 8 de marzo de 2011, el doctor Ruiz Soler presentó su *Contestación a Demanda Enmendada.*[6] En suma, negó la mayoría de las imputaciones en su contra.

El 27 de septiembre de 2011, el foro primario permitió una Tercera Demanda Enmendada presentada por la parte apelante. En respuesta, el Hospital San Cristóbal presentó su *Contestación a la Tercera Demanda Enemendada.*[7] Igualmente, el 25 de febrero de 2013, el doctor Ruiz Soler presentó su Contestación a la Tercera Demanda Enmendada. Por su parte, el 27 de enero de 2014, el doctor Rodríguez Rivera radicó su *Contestación a la Tercera Demanda Enmendada.*[8]

---

[4] *Íd.*, Apéndice B, págs. 279-286.

[5] *Íd.*, Apéndice A, págs. 2-92.

[6] *Íd.*, Apéndice B, págs. 294-300.

[7] Posteriormente, el 27 de agosto de 2012, el Hospital San Cristóbal instó una *Estipulación Transaccional Parcial, Moción Solicitando Desistimiento con Perjuicio y Solicitud de Sentencia* en la que informó haber alcanzado un acuerdo transaccional con la parte apelante. Por consiguiente, solicitó el desistimiento con perjuicio de la causa de acción presentada en su contra y de la doctora Rodríguez Zayas. Véase, Entrada Núm. 1 del caso TA2025AP00198 en el SUMAC, Apéndice A, págs. 2-92.

[8] *Íd.*

Así las cosas, el juicio en su fondo fue celebrado los días 17, 18, 19, 20, 23, 24, 25, 26, 27 de febrero de 2015 y los días 2, 3, 14, 15, 16, 29, 30 de marzo de 2015. Luego de varios incidentes procesales[9], el juicio en fondo reanudó los días 7 y 8 de octubre de 2021, así como el 10 y 24 de noviembre de 2021. La parte apelante presentó, como prueba testifical, las declaraciones de los señores Edmundo, Carmen Milagros, Carmen Lydia y Miriam García de Lleguas, Lisseida Bracero García y los doctores Ruiz Soler, Rodríguez Rivera, Heidi Pérez y Ramón Rodríguez Rivas, así como el testimonio pericial del doctor Antonio Álvarez Berdecía (doctor Álvarez Berdecía). Por su lado, la parte apelada presentó el testimonio de la doctora Maricel Santiago Texidor y como prueba pericial el testimonio del doctor José J. Gutierrez Núñez.

Durante los trámites procesales de rigor, el 2 de marzo de 2015, la parte apelante instó una *Moción Suplementaria de Oferta de Prueba* en la que señaló que durante el juicio el TPI le impidió realizar una oferta de prueba referente a la limitación del testimonio de su perito especialista en neurocirugía. De conformidad, marcó para récord la exclusión de su testimonio pericial. [10]

En adición, cabe destacar que, una vez la parte apelante sometió su caso, el doctor Rodríguez Rivera solicitó la desestimación del pleito por insuficiencia de prueba, solicitud que el foro primario determinó no resolver en esos momentos.[11]

---

[9] La parte apelante instó un recurso de certiorari en el que le imputó al foro primario haber limitado su derecho a contrainterrogar los peritos de la parte adversa. En respuesta, el 28 de abril de 2016, este Tribunal Apelativo en panel integrado por el Juez Bermúdez Torres, el Juez Flores García y el Juez Sánchez Ramos denegaron el recurso incoado. Véase, Entrada Núm. 1 del caso TA2025AP00198 en SUMAC, Apéndice A, págs. 257-259.

Posteriormente, la parte apelante instó un recurso de certiorari en la que solicitó la revisión de una Resolucion emitida por el TPI el 12 de mayo de 2016, mediante la cual rechazó la solicitud de inhibición del Juez Mariano Vidal Sáenz. El 27 de diciembre de 2016, un panel hermano compuesto por el Juez Bermúdez Torres, la Juez Nieves Figueroa y el Juez Flores García emitió una Resolución KLCE201601268 en la que denegó el auto de certiorari solicitado por la parte apelante. Véase, Entrada Núm. 1 del caso TA2025AP00198 en SUMAC, Apéndice A, págs. 226-232.

[10] Entrada Núm. 1 del caso TA2025AP00198 en el SUMAC, Apéndice B, págs. 376-382.

[11] *Íd.*, Apéndice A, págs. 2-92.

Aquilatada la prueba ante su consideración, el 12 de marzo de 2025, notificada el 18 de marzo de 2025, el TPI emitió una *Sentencia* en la que declaró no ha lugar la causa de acción presentada por la parte apelante.[12] Ello, tras consignar cuatrocientas veinticuatro (424) determinaciones de hechos.

En lo que respecta, el TPI determinó que, la parte apelante no pudo rebatir la presunción de corrección que le cobijaba al doctor Rodríguez Rivera y al doctor Ruiz Soler. El *foro a quo,* resolvió que la parte apelada no se apartó de las normas de conducta médica, sino que cumplió con las exigencias médicas reconocidas y le brindó al señor García de Lleguas un tratamiento adecuado. Por tanto, el TPI concluyó que no se probó la causa de acción por impericia médica.

Insatisfecha, el 2 de abril de 2025, la parte apelante presentó una *Moción Solicitando Reconsideración y al Amparo de la Regla 43 de Procedimiento Civil.*[13] En esencia, reiteró su contención en cuanto a que la parte apelada se apartó de la buena práctica de la medicina y ello causó directamente los daños y la muerte del señor García de Lleguas. Asimismo, resaltó que, la sepsis era altamente prevenible si la parte apelada hubiera realizado, en el tiempo previsto, un estudio de MRI para confirmar o descartar el diagnóstico diferencial del cordón espinal, según recomendado. Por tanto, solicitó al foro primario que determinara ciento treinta y ocho (138) determinaciones de hechos adicionales, enmendara las determinaciones de hechos ya realizadas y reconsiderara el dictamen emitido.

El 3 de julio de 2025, el TPI emitió y notificó una *Sentencia Nun Pro Tunc* de la cual se apela, mediante la cual corrigió errores clericales, aclaró que la demanda presentada no fue temeraria y reafirmó su determinación.

---

[12] *Íd.*, Apéndice A, págs. 133-223.
[13] *Íd.*, Apéndice A, págs. 98-129.

Inconforme, el 2 de agosto de 2025, la parte apelante instó ante nos el recurso de Apelación que nos ocupa y señaló al foro primario por la comisión de los siguientes errores:

Primer error: Erró [e]l TPI al no aplicar la doctrina de diagnóstico diferencial reconocida en nuestro ordenamiento aun cuando la Sentencia reconoce que los Apelados no descartaron (rule out) la condición médica en controversia.

Segundo error: El TPI incurrió en un error manifiesto, perjuicio y parcialidad en la apreciación de la prueba desfilada en el juicio. Sus conclusiones no son compatibles ni con las determinaciones de hechos de la misma Sentencia ni con la prueba admitida.

Tercer error: Erró el TPI al concluir que "la demandante no aportó prueba alguna que sostuviera que los demandados, Dr. Luis A. Rodríguez Rivera y Dr. Daniel Ruiz Soler, o alguno de ellos, se apartaran de las obligaciones y responsabilidad" lo cual es contrario a mismas determinaciones de Hecho de la Sentencia y a la prueba desfilada que incluyen admisiones de los Apelados en el juicio.

Cuarto error: El TPI incurrió en abuso de discreción, error manifiesto, prejuicio y parcialidad al limitar la prueba pericial de la parte demandante y excluir evidencia admisible.

Quinto error: el TPI incurrió en abuso de discreción, prejuicio y parcialidad la imponerles a los abogados de la parte demandante $1,000.00 de sanciones.

El 11 de agosto de 2025, la parte apelante presentó una *Moción al Amparo de la Regla 19 y 76 del Reglamento del Tribunal de Apelaciones,* en la que solicitó la presentación de la transcripción de la prueba oral en el caso de autos. A esos fines, el 21 de agosto de 2025, emitimos una *Resolución* mediante la cual concedimos a la parte apelante hasta el 22 de septiembre de 2025 para presentar la transcripción estipulada.

Tras varios asuntos procesales, el 3 de diciembre de 2025, la pare apelante presentó un *Alegato Suplementario*. El 12 de febrero de 2026, el doctor Ruiz Soler interpuso su *Escrito en Oposición a la Apelación* y el próximo día el doctor Rodríguez Rivera instó su *Alegato en Oposición a Apelación*.

Con el beneficio de la comparecencia de ambas partes, la transcripción de la prueba oral y el expediente que obra ante nos, procedemos a disponer del presente recurso, no sin antes delimitar la normativa jurídica aplicable.

**II.**

**A.**

Una de las fuentes de las obligaciones son los actos y las omisiones en los que intervenga cualquier género de culpa o negligencia, está obligado a reparar el daño causado. Artículo 1042 del *Código Civil de Puerto Rico* de 1930, 31 LPRA ant. sec. 2992 (Código Civil).[14] El Artículo 1802 del Código Civil, *supra* ant. sec. 5141, establece, en lo pertinente, que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado." La culpa o negligencia consiste en "la falta de debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias". *López v. Porrata Doria*, 169 DPR 135, 151 (2006); *Toro Aponte v. ELA*, 142 DPR 464, 473 (1997).

Para que prospere una acción de daños y perjuicios, el reclamante debe establecer: (1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión del demandado, y (3) el acto u omisión cual tiene que ser culposo o negligente. *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 483-484 (2022); *Pérez Hernández v. Lares Medical Center, Inc.*, 207 DPR 965, 976 (2021); *López v. Porrata Doria, supra*, pág. 150 (2006).

---

[14] Debido a que los hechos que suscitaron la causa de acción de autos ocurrieron antes del 28 de noviembre de 2020, hacemos constar la aplicación del Código Civil de 1930, el cual fue derogado por la Ley Núm. 55-2020, también conocida como el *Código Civil de Puerto Rico de 2020*. Esta última pieza legislativa, en su Artículo 1815, establece, en lo pertinente, lo siguiente: "La responsabilidad extracontractual, tanto en su extensión como en su naturaleza, se determina por la ley vigente en el momento en que ocurrió el acto u omisión que da lugar a dicha responsabilidad." 31 LPRA sec. 11720. Por tanto, para propósitos del presente caso, se hará referencia a las disposiciones de la legislación derogada.

La culpa o negligencia consiste en la falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. *Mena Pamias v. Jiménez Meléndez*, 212 DPR 758, 768 (2023); véase, además, *Pérez Hernández v. Lares Medical Center, Inc.*, *supra*, págs. 976–977; *López v. Porrata Doria, supra*, pág. 151; *Toro Aponte v. ELA*, *supra*, pág. 473.

Ahora bien, entre el acto culposo y el daño sufrido debe existir un nexo causal adecuado. *Pérez Hernández v. Lares Medical Center, Inc.*, *supra*, pág. 977. El nexo causal adecuado no es "causa de toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce, según la experiencia general". *Pérez Hernández v. Lares Medical Center, Inc.*, *supra*, págs. 976-977.

Así pues, una vez se imponga responsabilidad conforme a la normativa jurídica pormenorizada, se resarce al damnificado con un valor económico al daño sufrido. *Mena Pamias v. Jiménez Meléndez*, *supra*, pág. 769 (citando a *García Pagán v. Shiley Caribbean, etc.*, 122 DPR 193, 206 (1988).

**B.**

Es sabido que la responsabilidad de los médicos, por actuaciones u omisiones torticeras dentro del marco de su profesión, es de naturaleza subjetiva y extracontractual, de modo que las normativas antes expuestas derivadas del Artículo 1802 del Código Civil, *supra*, son de aplicación. *Martínez Marrero v. González Droz*, 180 DPR 579, 592 (2011). Para imponer responsabilidad civil a un médico por actos de mala práctica al amparo del referido artículo, es necesario que el demandante agraviado pruebe: (1) cuáles son las normas mínimas de conocimiento y de cuidado médico aplicables a los médicos generalistas y especialistas; (2) que el demandado no cumplió con dichas normas en el tratamiento del paciente; y (3) que

ello fue la causa del daño sufrido. *Arrieta v. de la Vega*, 165 DPR 538, 549 (2005). Lo anterior implica que, para prosperar en una demanda en daños y perjuicios por impericia médica, es indispensable demostrar, mediante preponderancia de la prueba, que la acción u omisión negligente del médico fue la causa que con mayor probabilidad ocasionó el daño y establecer, además, el vínculo causal que requiere el Artículo 1802 del Código Civil, *supra.* *Blas v. Hosp. Guadalupe*, 146 DPR 267, 322 (1998).

Sobre la norma mínima de cuidado exigible, se requiere que el médico brinde a sus pacientes aquella atención médica que, a la luz de los modernos medios de comunicación y de enseñanza, y conforme al estado de conocimiento de la ciencia y de la práctica prevaleciente en la medicina, satisface las exigencias generalmente reconocidas por la comunidad médica. *Arrieta v. de la Vega, supra,* pág. 549.

Nuestro Tribunal Supremo ha establecido que, en los casos sobre impericia médica profesional existe una presunción de corrección en el tratamiento brindado por el médico. *Íd.* Por tanto, el demandante debe derrotar la presunción y demostrar que el médico fue negligente y que su conducta negligente fue el factor que, con más probabilidad, causó los daños sufridos. *López v. Dr. Cañizares*, 163 DPR 119, 134-135 (2004). Como es sabido, "[l]a negligencia del médico, al igual que la de cualquier otra persona demandada al amparo del Art. 1802 del C[ó]digo Civil, supra, no se presume por el mero hecho de que el paciente haya sufrido un daño o que el tratamiento no haya tenido éxito." *Íd.*, pág. 135; *Rodríguez Crespo v. Hernández*, 121 DPR 639, 650 (1988). Igualmente, no basta con alegar una mera posibilidad de que el daño se debió al incumplimiento del médico con su obligación profesional para rebatir la presunción de corrección. *López v. Dr. Cañizares, supra,* pág. 135.

Asimismo, es preciso destacar que, al evaluar una acción en daños por impericia médica, el médico cuenta con una discreción para formular un juicio profesional en cuanto al diagnóstico y tratamiento médico, a tenor con las circunstancias particulares e individuales de cada paciente. *Íd.*, pág. 134; *Ramos, Escobales v. García, González*, 134 DPR 969, 975 (1993). Es por ello por lo que "el médico no incurre en responsabilidad civil si el tratamiento que le brinda a su paciente, aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica." *López v. Dr. Cañizares, supra*, pág. 134. En ese sentido, "[e]l error de juicio honesto e informado cometido por un médico en el tratamiento de su paciente tampoco constituye fuente de su responsabilidad." *Íd.*

## C.

Es sabido que los tribunales apelativos actúan como foros revisores. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Este Tribunal de Apelaciones tiene como tarea principal aplicar el derecho a los hechos particulares de cada caso. *Íd.* Dicha función, está cimentada en que el Tribunal de Primera Instancia haya desarrollado un expediente completo que incluya los hechos que haya determinado como ciertos ante la prueba que se haya ventilado. *Íd.* Como Tribunal de Apelaciones, no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos la credibilidad y, tampoco esbozamos determinaciones de hechos. *Hernández Maldonado v. Taco Maker*, 181 DPR 281, 289 (2011).

Ante ello, los foros revisores no intervendrán con las determinaciones de hechos coaligadas por el Tribunal de Primera Instancia, la apreciación sobre credibilidad y valor probatorio de la prueba presentada en sala. *Dávila Nieves v. Meléndez Marín, supra*, pág. 771; *Hernández Maldonado v. Taco Maker, supra*, pág. 289.

Como excepción, en caso de que la actuación del juzgador de los hechos medió pasión, prejuicio, parcialidad o error manifiesto, este Tribunal de Apelaciones puede descartar las determinaciones de los hechos. *Pueblo v. Millán Pacheco*, 182 DPR 595, 642 (2011) *Miranda Cruz y otros v. SLG Ritch*, 176 DPR 951, 974 (2009); *Soc. de Gananciales v. Centro Gráfico*, 144 DPR 952, 962 (1998). El Tribunal Supremo ha resuelto que, "si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas". *Álvarez v. Rivera*, 165 DPR 1, 13 (2005); *Dávila Nieves v. Meléndez Marín, supra*, pág. 772 (citando a *Abudo Servera v. ATPR*, 105 DPR 728, 731 (1977)).

Ante una alegación de pasión, prejuicio o parcialidad, los foros apelativos debemos evaluar si el juez o la jueza cumplió su función judicial de adjudicar la controversia específica conforme a derecho y de manera imparcial, pues solo así podremos descansar con seguridad en sus determinaciones de hechos. *Dávila Nieves v. Meléndez Marín, supra*, pág. 777.

Ahora bien, las conclusiones de derecho son revisables en su totalidad por el Tribunal de Apelaciones. *Hernández Maldonado v. Taco Maker, supra*, pág. 289. De igual forma, la norma de deferencia judicial no aplicará a la evaluación de la prueba pericial y documental. Ello es así toda vez que, en cuanto a las conclusiones de hecho basadas en prueba pericial o documental, los foros judiciales apelativos se encuentran en igual posición que los foros de instancia para apreciarla, adoptar su propio criterio, e inclusive, descartarla aunque sea técnicamente correcta. *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011); *Arrieta v. de la Vega, supra*, pág. 551.

Sobre el valor probatorio que les correspondan los tribunales a los testimonios periciales, la Regla 702 de Evidencia de 2009, 32 LPRA Ap. VI, dispone lo siguiente:

> Cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia una persona testigo capacitada como perita —conforme a la Regla 703— podrá testificar en forma de opiniones o de otra manera.
>
> El valor probatorio del testimonio dependerá, entre otros, de:
>
> (a) Si el testimonio está basado en hechos o información suficiente;
>
> (b) si el testimonio es el producto de principios y métodos confiables;
>
> (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;
>
> (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;
>
> (e) las calificaciones o credenciales de la persona testigo, y
>
> (f) la parcialidad de la persona testigo.

Por otra parte, en cuanto a la capacidad de los testigos peritos, la Regla 703 de Evidencia de 2009, *supra*, dispone que:

> (a) Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita.
>
> (b) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio.
>
> (c) La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

Pertinente señalar, la Regla 703 de Evidencia de 2009, es análoga a la Regla 53 de Evidencia de 1979, 32 L.P.R.A. Ap. IV, que regula lo relativo al testimonio pericial, y a tales efectos dispone:

> (A) Toda persona está cualificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficientes para cualificarla como un experto o perito en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza,

adiestramiento o instrucción deberán ser probados antes de que el testigo pueda declarar como perito.

(B) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de un testigo pericial podrán ser probados por cualquier evidencia admisible, incluyendo su propio testimonio.

En lo particular, el Tribunal Supremo reconoce la amplia liberalidad para que una persona quede cualificada como perito. A esos efectos, la carencia de especialidad concernida a un testigo perito afecta el peso de la prueba y no su cualificación. Ello, al expresar que la especialidad esta circunscrita al valor probatorio y no a la admisibilidad de cualificación pericial. *Dye-Tex Puerto Rico, Inc. v. Royal Ins. Co. of Puerto Rico*, 150 DPR 658, 663-665 (2000).

### III.

En el presente caso, la parte apelante cuestionó la *Sentencia* emitida por el TPI, mediante la cual determinó que la causa de acción interpuesta por impericia médica no procedía. Ello, pues la parte apelante razonó que, la parte apelada incurrió en impericia medica tras apartarse de la buena práctica de la medicina. Argumentó que, el foro primario incidió en la comisión de cinco (5) errores concernientes a cuestiones de derecho y a la apreciación de la prueba ante su consideración.

Por su estrecha relación atenderemos el primer, segundo y tercer error en conjunto.

En cuanto al primer señalamiento de error, la parte apelante esgrimió que, el foro primario incidió al no aplicar la doctrina de diagnóstico diferencial. Particularmente, señaló que, el 23 de julio de 2008, tanto el doctor Rodríguez Rivera como el doctor Ruiz Soler coincidieron en la necesidad de realizarle un estudio de MRI al señor García de Lleguas para descartar o confirmar un diagnóstico de comprensión del cordón espinal, según recomendado por la doctora Heidy Pérez. Empero, añadió que, los doctores abandonaron la orden del estudio de imagen y otorgaron el alta al paciente, lo que

resultó en la causa próxima del sufrimiento y la muerte del señor García de Lleguas.

Por su parte, en cuanto al segundo y tercer error señalado, la parte apelante manifestó que el TPI cometió errores sobre la apreciación que le mereció la prueba que tuvo ante sí, y por la cual determinó que la causa de acción interpuesta por impericia médica no procedía.

Conforme las normas jurídicas pormenorizadas, se reconoce que los médicos cuentan con una discreción inherente para formular un juicio profesional en cuanto al diagnóstico y tratamiento médico que determine procedente, de conformidad con las características y circunstancias particulares e individuales de cada paciente. *López v. Dr. Cañizares, supra,* pág. 134; *Ramos, Escobales v. García, González, supra,* pág. 975. "[E]l médico no incurre en responsabilidad civil si el tratamiento que le brinda a su paciente, aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica." *López v. Dr. Cañizares, supra,* pág. 134.

En adición, los médicos gozan con una presunción de corrección en el tratamiento que brindan. *Arrieta v. de la Vega, supra,* pág. 549. Consecuentemente, le corresponde a quien impugna dicho tratamiento derrotar la presunción y probar que el médico se apartó de las normas de cuidado exigidas por su profesión. *López v. Dr. Cañizares, supra,* págs. 134-135. Ahora, el Tribunal Supremo ha resuelto que, "si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas". *Álvarez v. Rivera,* supra, pág. 13. En ese sentido, un análisis concienzudo e independiente de la prueba pericial ante nuestra

consideración nos convence que erró el TPI al determinar que la parte apelante no derrotó la presunción de corrección en el tratamiento que brindó el doctor Rodríguez Rivera y, por ende, probó que este incurrió en impericia profesional.

En esa línea, nos corresponde evaluar, si la prueba presentada por la parte apelante logró establecer: (1) las normas mínimas de conocimiento y cuidado médico; (2) que la parte apelada se apartó de las normas de tratamiento del paciente, y (3) que el incumplimiento del médico fue la causa de muerte del señor García de Lleguas. *Arrieta v. de la Vega*, supra, pág. 549.

Ahora bien, adelantamos que tras un análisis cuidadoso del expediente ante nuestra consideración y evaluada la prueba oral determinamos que el foro primario incurrió en los errores señalados con respecto al Dr. Rodríguez Rivera y su aseguradora SIMED.

De entrada, no albergamos duda de que, en lo concerniente a las normas de conocimiento y cuidado médico, existe consenso entre los testigos y peritos, que el estudio de resonancia magnética (MRI) consistía en el método adecuado para descartar la posibilidad de una compresión en el cordón espinal. Es decir, el estudio de resonancia magnética materializa una herramienta de diagnóstico diferencial dirigida a confirmar la existencia de una compresión del cordón espinal. Conforme al resultado que arroje dicho estudio, procede entonces delinear la causa de la condición y, posteriormente, determinar el tratamiento médico correspondiente. En ese sentido, no existe controversia en cuanto a que el examen de MRI era el método idóneo para suplir un diagnóstico en el caso de autos.

Dentro del marco médico en controversia, resulta pertinente aclarar la relación entre un absceso epidural y el síndrome del cordón. En esencia, el absceso epidural constituye una de las

posibles causas de compresión del cordón espinal.[15] Cabe destacar que, los peritos coincidieron en que dicha condición es una causa poco común. Asimismo, dentro de los síntomas asociados a su detección tardía se ha identificado la denominada triada clínica, la cual consiste en la presencia de déficit neurológico, fiebre y dolor.[16]

Así pues, la controversia medular gira en torno al momento en que se debió realizar el referido estudio. En ese sentido, el foro adjudicador consignó que la sospecha de compresión del cordón espinal no era una emergencia que merecía prontitud en el diagnóstico del señor García de Lleguas.

Con ello, durante el juicio, el doctor Álvarez Berdecía, perito neurocirujano de la parte apelante, esbozó que, conforme a la literatura médica existente, la mejor práctica de la medicina exige identificar los factores de riegos asociados a dicha condición. Entre estos, mencionó el uso de inmunosupresores, alcoholismo, cáncer, diabetes o enfermedades renales.[17]

En esa línea, los peritos de la parte apelada, el doctor Nieves Colomer, perito especialista en medicina de emergencia, y el doctor Gutiérrez Núñez, perito internista especialista en infecciones, manifestaron que, el dolor de cuello y adormecimiento del señor García de Lleguas consistía en subjetivas de parestesia, común en personas que adquieren lesiones por el uso excesivo de fuerza. En tal caso, coincidieron en que lo antes no representaba una emergencia de acción inmediata. Sin embargo, el doctor Gutiérrez Núñez reconoció que los síntomas de parestesia y la disminución de fuerza pudieran ser considerados como un déficit neurológico. Aun así, determinó que, por tratarse de un síntoma sugestivo, en el caso

---

[15] Transcripción de la prueba oral (TPO), 23 de febrero de 2015, pág. 109, líneas 13-21.

[16] *Íd.*, pág. 132, líneas 7-18.

[17] TPO, 25 de febrero de 2015, págs. 77-78. El doctor Nives Colomer, testigo perito de la parte apelada también coincidió con el análisis preponderado por el doctor Álvarez Berdecía. Véase también, TPO, 14 de marzo de 2016, págs. 143-146.

de autos el señor García de Lleguas no presentaba un déficit neurológico.[18]

Similar al doctor Nieves Colomer, el doctor Gutiérrez Núñez, expresó que, aun cuando una resonancia magnética era el examen adecuado para abordar el diagnóstico de absceso epidural, ciertamente, el 23 de julio de 2008, los síntomas que presentaba el señor García Lleguas no albergaban sospecha. Ello, tras carecer de un foco neurológico definido o síntomas de fiebre que le llevaran a anticipar el precipitado diagnóstico.[19]

Contrario al análisis adoptado por el foro primario, el doctor Álvarez Berdecía, testificó que, el 23 de julio de 2023, el cuadro clínico presentado por el señor García de Lleguas consistía en una situación de emergencia que exigía un diagnóstico diferencial. Lo anterior, por enfrentar síntomas consistentes de dolor severo y déficit neurológico, lo que incluye disminución de movimiento mandibular y descenso sugestivo de fuerza.[20] Es meritorio señalar que, el doctor Álvarez Berdecía es doctor en neurocirugía, quien basó su análisis en estudios particulares de la neurociencia.

De hecho, al ser confrontado, el doctor Rodríguez Rivera aceptó que, el 23 de julio de 2008 la reproducción del examen de MRI debía realizarse con prontitud.[21] Lo anterior surgió, luego de que la doctora Pérez Román recomendara identificar la necesidad de un diagnóstico diferencial para descartar o confirmar la existencia de una compresión del cordón espinal.[22] Por tal razón, el propio doctor Rodríguez Rivera reconoció que resultaba inconsecuente continuar el manejo del paciente en el Hospital San Cristóbal ante

---

[18] TPO, 30 de marzo de 2016, pág. 29, líneas 1 "/4-33.
[19] TPO, 29 de marzo de 2016, págs. 5-7.
[20] TPO, 23 de febrero de 2015, pág. 103, líneas 23-34.
[21] TPO, 27 de febrero de 2015, pág. 92, líneas 30-34; pág. 93, línea 1.
[22] TPO, 27 de febrero de 2015, pág. 92, líneas 16-26.

la ausencia de un estudio expedito de resonancia magnética y la falta de un especialista en neurocirugía.[23]

Por otro lado, el doctor Nieves Colomer, admitió que, los síntomas presentados por el señor García de Lleguas el 23 de julio de 2008 eran compatibles con una posible lesión del cordón espinal. Asimismo, al ser contrainterrogado, aceptó la posibilidad de que el síndrome de compresión espinal constituyera una condición de emergencia. No obstante, concluyó que el alta médica concedida al señor García de Lleguas fue adecuada.[24]

Ahora bien, del propio testimonio del doctor Nieves Colomer, y en armonía con los procesos del Hospital San Cristóbal, surge que, conforme al marco regulatorio de las instituciones hospitalarias, los médicos son responsables de ofrecer la atención necesaria a los pacientes que presentan una condición de emergencia hasta comprender su estabilización. En casos como el de autos, cuando un hospital carece de recursos o especialistas, la buena práctica de la medicina exige proceder con el traslado del paciente a una institución que cuente con los recursos necesarios.[25] Al así expresarse, su testimonio contradice la conclusión previamente sostenida.

Como corolario de lo anterior, colegimos que el foro primario incurrió en error al determinar que, el 23 de julio de 2008, las actuaciones del doctor Rodríguez Rivera se ajustaron al estándar médico aplicable al conceder el alta al señor García de Lleguas en ausencia de un diagnóstico médico.[26] En tales circunstancias, el doctor Rodríguez Rivera debió adherirse a los procedimientos

---

[23] TPO, 27 de febrero de 2015, pág. 95, líneas 14-22.

[24] TPO, 15 de marzo de 2016, pág. 50, líneas 22-33.

[25] TPO, 15 de marzo de 2016, pág. 54, líneas 21-33; pág. 55 líneas 1-5. Véase además, Entrada Núm. 1, Apéndice C, pág. 1002-1018. Inciso B, Rules and Regulations of San Cristobal Medical Staff, February 2006.

[26] Surge del récord médico del señor García de Lleguas que el 23 de julio de 2008 el doctor Rodríguez Rivera identificó un diagnóstico de "dolor de cuello". Es de conocimiento lego, que el dolor de cuello es un síntoma y no un diagnóstico. Véase, Entrada 1, Apéndice C, pág. 478.

relacionados a ordenar el traslado del Hospital San Cristóbal ante la ausencia del servicio de MRI. Ello, pues se desprende del expediente que, los únicos esfuerzos desplegados por el facultativo fue comunicarse con la CFSE de Ponce y con el Hospital Industrial en aras de indagar si dichas instituciones contaban con el servicio de resonancia magnética (MRI). No obstante, más allá de estas gestiones informativas, el doctor Rodríguez Rivera no realizó diligencia alguna encaminada a coordinar o gestionar el traslado inmediato del paciente a una institución que contara con los recursos necesarios para realizar el referido estudio con la premura que el cuadro clínico ameritaba. Lejos de procurar un manejo hospitalario adecuado, optó por transferir su responsabilidad a la CFSE mediante un referido emitido el 23 de julio de 2008 que, además de no especificar la necesidad de realizar un estudio de MRI, tampoco contenía una recomendación expresa para la realización de dicho examen diagnóstico. El referido lee como sigue:

> Please evaluate now this 51 y/o male who came to persistent neck pain after been working cutting trees last week. Patient despite tx (treatment) continued worsening and now report weakness and paresthesia at right arm. Case discussed with Dr. Acosta at the Industrial Hospital and Dra. Marisel Santiago at Regional Office and send there for detail evaluation and determine what studies and further management may need. Thanks.[27]

En consecuencia, la omisión de gestionar un diagnóstico oportuno y adoptar las medidas necesarias para garantizar el diagnóstico requerido redundó en actuaciones negligentes que incidieron adversamente en la atención médica brindada. Por ello, concluimos que el doctor Rodríguez Rivera se apartó del estándar de cuidado exigido por la mejor práctica de la medicina.

Como resultado de lo anterior, el señor García de Lleguas desarrolló una infección en el cordón espinal frontal, diagnosticada el 29 de julio de 2008 mediante un estudio de MRI, luego de que el

---

[27] Véase, Entrada 1, Apéndice B, pág. 346.

paciente acudiera en estado crítico a la sala de emergencia. Cabe destacar que, tanto el doctor Nieves Colomer como el doctor Álvarez Berdecía coincidieron en que la ausencia de un diagnóstico temprano constituyó la causa próxima de la muerte del señor García de Lleguas. Al así hacer, resulta meridianamente claro que el incumplimiento del médico fue la causa de muerte del señor García de Lleguas.

Con respecto al doctor Ruiz Soler, no surge de la prueba consignada en caso de epígrafe que este se haya apartado de la mejor práctica de la medicina. En primer lugar, el 23 de julio de 2008, el doctor Ruiz Soler no había perfeccionado una relación médico-paciente con el señor García de Lleguas al momento de su consulta con la doctora Pérez y el doctor Rodríguez Rivera. En su defecto, la conversación entre los galenos constituyó una opinión informal de carácter consultivo. Por ende, sus expresiones se limitaron a recomendaciones médicas y no a órdenes clínicas.

Asimismo, tampoco surge del expediente ante nuestra consideración prueba que permita imputarle responsabilidad al doctor Ruiz Soler por los eventos ocurridos el 29 de julio de 2008, fecha en que ordenó el traslado inmediato del señor García de Lleguas al Centro Médico para la realización del estudio de resonancia magnética. A la luz de estas circunstancias, resulta forzoso concluir que, el doctor Ruiz Soler no se apartó de las normas de la mejor práctica de la medicina y, por tanto, no procede que este indemnice a la parte apelante en concepto de daños y perjuicios toda vez que, no incurrió en impericia médica.

En cuanto al cuarto señalamiento de error, la parte apelante arguyó que, el foro primario incidió al limitar la prueba pericial del señor Álvarez Berdecía por tratarse de un perito especialista en neurocirugía, carente de conocimiento en el área de especialidad del

doctor Rodríguez Rivera, emergenciólogo y el doctor Ruiz Soler, especialista en medicina interna.

En reiteradas ocasiones, nuestro más alto foro ha reconocido que el testimonio pericial bajo el marco de la Regla 53 de Evidencia, *supra*, debe ser adoptado con amplia liberalidad. Para que una persona quede cualificada como perito, es imprescindible satisfacer un grado de conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para ser calificado como experto en el asunto del cual prestará testimonio y que sirva de ayuda al juzgador. A esos efectos, la carencia de especialidad concernida a un testigo perito afecta el peso de la prueba y no su cualificación. Ello, al expresar que la especialidad esta circunscrita al valor probatorio y no a la admisibilidad de cualificación pericial. *Dye-Tex Puerto Rico, Inc. v. Royal Ins. Co. of Puerto Rico*, págs. 663-665.

Tras examinar la prueba que obra en autos, concluimos que el foro primario erró al limitar el testimonio del doctor Álvarez Berdecía exclusivamente a su campo de especialidad en neurocirugía y excluir sus opiniones respecto a las actuaciones del doctor Rodríguez Rivera y del doctor Ruiz Soler.

Ciertamente, las cualificaciones del doctor Álvarez Berdecía reflejan conocimiento particular en el área de la neurocirugía, aun así, no le hace ajeno a la buena práctica de la medicina. Incluso, aun cuando expresó carecer de conocimiento especializado en medicina interna y emergencia, enfatizó que, las responsabilidades de la práctica médica son aplicables a todos los galenos de la profesión.[28] Igualmente, puntualizó que parte de su entrenamiento fue forjado en sala de emergencia.[29]

Ateniente a la liberalidad que nuestros Tribunales han de reconocer en torno a las cualificaciones de los testigos peritos,

---

[28] TPO, 18 de febrero de 2015, pág. 41, líneas 29-34.
[29] TPO, 18 de febrero de 2015, págs. 25-26, líneas 30-34, 1-10.

entendemos que el foro primario debió permitir las opiniones del doctor Álvarez Berdecía sobre los asuntos medulares en controversia y otorgarle el valor probatorio que le mereciera. Al así no proceder, el TPI incurrió en el cuarto error señalado.

Por último, la parte apelante alegó que, el foro apelado erró al imponerle sanciones económicas a la representación legal de la parte apelante.

A tenor con nuestra normativa, la Regla 44.2 de Procedimiento Civil, *supra*, reconoce la facultad de los tribunales para imponer sanciones económicas en todo caso y en cualquier etapa de los procedimientos por conducta constitutiva de demora, inacción, abandono, obstrucción o falta de diligencia en perjuicio de la eficiente administración de la justicia.

Atestamos que, en atención a las circunstancias particulares en este caso, el foro primario no incurrió en el error señalado.

Según obra del expediente ante nuestra consideración, el 19 de febrero de 2008, la parte apelante radicó un recurso en *Auxilio de Jurisdicción* ante el foro apelativo. En ausencia de respuesta expedita, el 20 de febrero 2015, el foro primario continuó el juicio en su fondo, según calendarizado. En cambio, el doctor Álvarez Berdecía, testigo perito de la parte apelante, llamado a testificar, no compareció. Al así proceder, el TPI sancionó a la licenciada Manfredy y al licenciado Rivera Ruiz, representantes legales de la parte apelante, por la suma de quinientos dólares ($250.00) cada uno para un total de quinientos dólares ($500) de sanción.

Asimismo, el 25 de febrero de 2015, durante el *voir dire* del doctor Álvarez Berdecía, la licenciada Manfredy solicitó al Tribunal una oferta de prueba, en cambio, el foro primario lo determinó improcedente. En desacuerdo, la licenciada Manfredy refutó su postura en un tono que el foro adjudicador consideró sarcástico. Por estimar que tal conducta constituía una falta de respeto al Tribunal,

el foro primario le impuso una sanción adicional de quinientos dólares ($500.00) a la licenciada Manfredy para una cantidad total de mil dólares ($1,000.00) en sanciones. [30]

A la luz de lo anterior, concluimos que el foro primario actuó en virtud de sus facultades discrecionales al imponer sanciones por conducta constitutiva de demora y perjuicio a la administración de la justicia. Nótese que, las sanciones económicas impuestas se circunscriben a actos que impactan la economía procesal de nuestros tribunales y la conducta legal frente a la clase togada. Consecuentemente, el quinto señalamiento de error no se cometió.

Tras ponderar la totalidad del expediente y la transcripción ante nos, colegimos que el foro primario incurrió en error manifiesto con relación a la apreciación de la prueba que tuvo ante sí, particularmente al dirimir el valor probatorio de la prueba pericial presentada, en cuanto al Dr. Rodríguez Rivera. Consecuentemente, determinamos que procede la acción sobre daños y perjuicios interpuesta por la apelante en virtud de que el Dr. Rodríguez Rivera incurrió en impericia médica. No obstante, confirmamos la *Sentencia* apelada con relación al Dr. Ruiz Soler debido a que no incurrió en impericia médica tras su rol limitarse a recomendaciones médicas y no órdenes médicas. Por tanto, devolvemos el caso ante el foro primario para que valorice los daños ocasionados por el Dr. Rodríguez Rivera y, su aseguradora SIMED, a la parte apelante en concepto de daños y perjuicios puesto que este galeno incurrió en impericia médica.

**IV.**

Por los fundamentos que anteceden, confirmamos, en parte, y revocamos, en parte, la *Sentencia Nun Pro Tunc* apelada y se devuelve al foro primario para que celebre una vista en la que

---

[30] TPO, 25 de febrero de 2015, pág. 58-60.

valorice los daños ocasionados por el Dr. Rodríguez Rivera y SIMED a la parte apelante.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

La Jueza Rivera Marchand y la Jueza Boria Vizcarrondo concurren sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones